VON LINGEN and others *v.* DAVIDSON and others.

(Libel.)

DAVIDSON and others *v.* VON LINGEN and others.

(Cross-Libel.)

*(Circuit Court, D. Maryland. November 8, 1880.)*

1. CHARTER-PARTY—"ABOUT TO SAIL."—The words "about to sail from Benizaf with cargo for Philadelphia," contained in a charter-party, *held* to mean, under the circumstances of this case, *about ready* to sail with cargo.

2. SAME—SAME.—*Held, further,* therefore, that a vessel not more than three-elevenths loaded, and the time of finishing subject to all the contingencies of wind, weather, labor, and boats incident to an open roadstead on the northern coast of Africa, was not "about to sail" within the meaning of the charter-party.

*Von Lingen v. Davidson,* 1 FED. REP. 178, *reversed.*

FACTS FOUND BY THE COURT.

(1.) The British steamer Whickham, owned by T. H. Davidson and others, the defendants in the original libel, sailed from Shields on the ninth of July, 1879, bound for Lisbon, where she arrived on the 16th, and, having discharged her cargo, sailed again in ballast on the 23d for Benizaf, on the coast of Morocco, to take a load of iron ore under a charter for Philadelphia. She passed Gibraltar on the 25th, and arrived at Benizaf at 4:30 P. M. of Saturday, the 26th. She began taking in cargo under the charter for Philadelphia during the forenoon of Monday, the 28th. On that day she took on board 115 tons, and on the 29th about 90 tons, but on the 30th none, and on the 31st only four boat loads. Dur-

ing this time there was delay in delivering the cargo on board, as other vessels in port were entitled to precedence in loading. After the 31st the cargo was put on board with as much dispatch as could have been expected at that place, and it was all in on the seventh of August, at 5 : 30 P. M. An hour later the vessel sailed, and, stopping five hours at Gibralter for coal on the 9th, arrived at Philadelphia on the second of September. She completed her unloading at that port on the 7th.

(2.) The usual cargo at Benizaf is iron ore. In loading, a vessel lies out in the stream about a quarter of a mile from the shore, and the ore is taken to her in small boats of from five to seven tons burden each. It is then passed up the ship's side in baskets. Two or three stages are put up between the boats and the ship's decks, and two men on each stage receive and pass the baskets. This is the only way of loading such cargo at that port.

(3.) About the first of August, Gregg & Co., a firm of ship-brokers in Philadelphia, were authorized by cable message from the owners in England to get a charter for the Whickham to carry grain from the United States on her return voyage. Not being able to do this in Philadelphia, the firm, on the first of August, telegraphed Mr. Erickson, a ship broker in Baltimore, to look for a charter in that city. In their telegram it was said that the vessel "had sailed, or was about to sail, from Benizaf with cargo for Philadelphia." The precise form of the authority given by the owners to Gregg & Co. is nowhere shown from the evidence, further than may be inferred from the telegram to Erickson.

(4.) A short time before the first of August, Schumacker & Co., of Baltimore, the original libellants, employed Mr. Ford, another ship-broker in that city, to procure them a vessel to take a cargo of grain to Europe which they were under contract to ship in August. He finding that steamers for that month were scarce, and hearing of the Whickham, took Mr. Erickson to the office of Schumacker & Co., and suggested that she might do. At the interview which then took place it was understood by all parties that a vessel was wanted that could be loaded in August, and that no other would answer

the purpose. Schumacker & Co., doubting whether the Whickham could arrive in time, wanted a guaranty that she would, but this was declined. All parties then made their calculations as to the probable time of her arrival upon the basis of the language in the telegram, and finally Schumacker & Co. agreed to take her; first, however, providing that she might be loaded in Philadelphia or Baltimore at their option, intending if she did not arrive in time for Baltimore to get her cargo under their contract at Philadelphia. In these calculations it was assumed by all that she would get away from Benizaf not later than the second of August, and that her voyage across would probably be about 20 days. This all occurred at Baltimore on the first of August, and it does not appear from the evidence that any of the parties, either in Philadelphia or Baltimore, knew anything of the movements of the vessel except as they were to be inferred from the telegram. There was no communication with Benizaf by telegraph, the nearest telegraphic station being at Gibraltar, which was a day's sail away.

(5.) As soon as the bargain was concluded, Erickson sent to Gregg & Co. for a charter-party in form. They immediately sent the draft of one in which the vessel was described as "sailed from or loading at Benizaf." This Schumacker & Co. declined to accept on the ground that their agreement was for a vessel that "had sailed or was about to sail from Benizaf with cargo for Philadelphia." This being communicated to Gregg & Co. they at once sent forward a new draft to meet the wishes of Schumacker & Co., and using the language they insisted upon. This new draft reached Baltimore on the second of August, and was duly executed by all parties. This is the instrument, a copy of which is marked Exhibit A, and filed with the original libel. From this it appears that in the printed blank which was used there were the following words: "Charterers to have option of cancelling this charter-party should vessel not have arrived at loading port prior to ——." These words were erased by drawing a pen through them before signing.

(6.) Schumacker & Co. having ascertained, on the ninth of

August, that the steamer passed Gibraltar outwards from Benizaf on that day, and being then satisfied that she would not arrive in time to load either at Baltimore or Philadelphia in August, at once set about securing another vessel, and on the 16th got one, which they afterwards loaded at an increased cost of freight to them over what they would have been compelled to pay the Whickham of $1,988.25. It is agreed that this new charter was effected on as favorable terms as it could have been in the month of August, and that if Schumacker & Co. are entitled to recover at all it must be for the increase in the cost of freight which they paid.

(7.) The discharge of the cargo of iron ore from the Whickham was completed with dispatch at Philadelphia, and on the seventh of September she sailed for Baltimore, where she arrived on the 9th, and was tendered Schumaker & Co., under the charter, on the 11th. They declined to accept her for the reason that, as they claimed, when the charter-party was entered into she had neither sailed nor was about to sail from Benizaf, within the meaning of that provision in the charter, as understood by the parties. Another charter was then obtained, but at a loss to her of $4,093.18, as of May 10, 1880. It is agreed that the charter was as favorable as any that could have been effected, and that if her owners are entitled to recover at all, it must be for the above amount as their loss.

*Blackiston & Thomas*, for appellants.

*A. Sterling, Jr.*, Esq., for appellees.

WAITE, C. J. The only question in this case is whether, on the first of August, 1879, the Whickham was "about to sail from Benizaf with cargo for Philadelphia," within the meaning of that term as used in the charter sued on. The owners in England, having accepted the contract made for them by their agents in Philadelphia and Baltimore, are bound by its terms just as their agents would be were they principals. The language used must therefore be interpreted, if possible, as the parties in Baltimore understood it when they were contracting.

It is conceded that if the Whickham was "about to sail," giving that phrase the effect it was intended to have, Schumacker & Co. took the risk of her arrival in time to answer the purposes; but if she was not, that the warranty to that effect was broken, and her owners must make good the loss caused by the breach.

"About" is a relative term. It may indicate one thing when applied to one state of facts, and another under different circumstances. "Contracts, when their meaning is not clear, are to be construed in the light of the circumstances surrounding the parties when they were made, and the practical interpretations which they, by their conduct, have given the provisions in controversy." *Lowber* v. *Bangs*, 2 Wall. 737. The prominent fact in this case is that a vessel was wanted to load at Baltimore in August. This was brought directly to the attention of all the contracting parties, and it was well understood that Schumacker & Co. would not take the Whickham unless there was a reasonable probability of her arrival in time. That the charter would not have been made if it had been known that she could not get away from Benizaf until the evening of the 7th is apparent from the fact that, as soon as it was ascertained she did not pass out from Gibraltar until the 9th, steps were taken to get another vessel in her place. In addition to this, the testimony shows that when the parties were making their calculations as to the time she would probably reach Baltimore, it was assumed that she either had sailed, or, at the latest, would sail on the next day, which was the second of August. It was not supposed that her time to Philadelphia would be less than 20 days, and this, with a reasonable allowance for unloading, could not put her in Baltimore earlier than the 28th or 29th, if she sailed as late as the 2d. Her actual time to Philadelphia exceeded the estimate, but this, if her sailing had been prompt, would have been at the risk of the charterers.

Parol evidence is not admissible to vary the terms of a written instrument, but, where ambiguity exists, it may be given in aid of interpretation to show the facts and circum-

stances in the midst of which the parties were acting. These assumptions and calculations are facts in the light of which this indefinite word is to be read. Since "about" may mean a longer or shorter period, according to circumstances, these circumstances tend to show what limitation the parties put upon it in this transaction.

Another important fact is found in the practical interpretation which the parties have, by their conduct, put on the language they have used. Gregg & Co., in Philadelphia, seem to have assumed that the vessel would be about to sail from Benizaf with cargo, within the meaning of their telegraphic authority to Erickson, if she were there loading, and they consequently, in their first draft of the charter-party, described her as "sailed or loading at Benizaf." This, however, did not meet the views of Schumacker & Co., and they declined to enter into the contract on those terms, claiming that they had agreed for a vessel that was "about to sail." In this way they, in effect, said that, according to their understanding of the language upon which they had been acting, a vessel might not be "about to sail" if she was only loading at such a port as Benizaf, and with such a cargo as she was getting there. To this suggestion Gregg & Co. apparently assented without objection, for they immediately sent forward the new charter-party, with their signature affixed, in which the vessel was described in accordance with the language they had used in their telegram to Erickson. Such conduct shows clearly that the word "about" was used advisedly, as indicating some shorter period of time than loading would necessarily imply.

Under these circumstances it seems to me clear that the parties must have understood their language to mean that the Whickham had either sailed or was *about ready* to sail with cargo. It is difficult to reconcile any other interpretation with the undisputed facts in reference to which the parties were acting. Taking this as the effect of the contract, I have had no difficulty in reaching the conclusion that the vessel was not in the condition she was represented to be. Her carrying capacity was something over 1,100 tons. Her

cargo was iron ore, which could only be put on board in a particular way, and by hand, without the use of machinery. Less than 300 tons were then in, and although the utmost diligence was employed the remainder was not got on board until late in the sixth day afterwards. In short, she was not more than three-elevenths loaded, and the time of finishing was subject to all the contingencies of wind, weather, labor, and boats incident to an open roadstead on the northern coast of Africa. Certainly in this condition she could not be considered as ready to sail. At most she was only loading, with the time of her sailing to a great extent uncertain. It is true that the term "about" implies in such a connection the lapse of some time, but not enough, as it seems to me, in this case, to enable the vessel to do what was required of her to put herself in a condition to sail with cargo under her charter from Benizaf to Philadelphia.

It follows that the original libellants are entitled to recover, and that the cross-libel must be dismissed. A decree may be prepared accordingly.

### CONCLUSIONS OF LAW.

1. That the Whickham was not about to sail from Benizaf on the first of August, within the meaning of that term as used in the charter-party.

2. That Schumacker & Co. are entitled to recover from the defendants to their libel the sum of $1,988.25, and the interest thereon from September 11, 1879.

3. That the cross-libel of T. H. Davidson and others must be dismissed.