## DAVISON & Another *v.* VON LINGEN & Others.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MARYLAND.

Argued December 12, 1884.—Decided January 5, 1885.

A stipulation in the charter-party of a steamer, that she is "now sailed, or about to sail, from Benizaf, with cargo, for Philadelphia," is a stipulation that she has her cargo on board and is ready to sail.

A charter-party with the above stipulation was made on the 1st of August, in Philadelphia. The steamer was at Benizaf, in Morocco, only three-elevenths loaded, and did not sail for Philadelphia till August 7, and left Gibraltar August 9. Before signing the charter-party, the charterers asked to have in it a guaranty that the steamer would reach Philadelphia in time to load a cargo for Europe in August, but this was refused. They declined to have inserted the words "sailed from, or loading at Benizaf." On learning when the steamer left Gibraltar, they proceeded to look for another vessel. The unloading of the steamer at Philadelphia was completed September 7, but the charterers repudiated the contract: *Held,*

(1.) The stipulation was a warranty or a condition precedent, and not a mere representation;

(2.) Time and the situation of the vessel were material and essential parts of the contract;

(3.) The charterers had a right to repudiate the contract, and to recover from the owners of the steamer the increased cost of employing another vessel.

The facts which make the case are stated in the opinion of the court.

*Mr. A. Stirling, Jr.,* for appellants, submitted on his brief.

*Mr. T. Wallis Blakistone* (*Mr. John H. Thomas* was with him) for appellees.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

On the 1st of August, 1879, a charter-party was entered into between the owners of the steamship Whickham and the firm of A. Schumacher & Co., composed of George A. Von Lingen, Carl A. Von Lingen, and William G. Atkinson, of which the parts material to this case are as follows.

" *Grain Charter Party,* —— *Steamer.*

PHILADELPHIA, *Aug. 1st,* 1879.

It is this day mutually agreed between T. H. Davison, Esq., owner of the Br. steamship 'Whickham,' of London, built 1876, at Newcastle, of 1124 net tons register or thereabouts, classed 100 A 1 in Br. Lloyds, now sailed or about to sail from Benizaf with cargo for Phila., and Mess. A. Schumacher & Co.: That the said steamship, being tight, staunch, and strong, and in every way fitted for the voyage, with liberty to take outward cargo to Phila. for owners' benefit, shall, with all convenient speed, sail and proceed to Philada. or Balto., at charterers' option, after discharge of inward cargo at Phila., or as near thereunto as she may safely get, and there load afloat from said charterers, or their agents, a full and complete cargo of grain, ᵃⁿᵈ/ₒᵣ other lawful merchandise, excluding petroleum or its products. Vessel to load under inspection of either American or British Lloyd's surveyors, at her expense, and to comply with their rules. The cargo to be brought to and taken from alongside at merchants' risk and expense, not exceeding what she can reasonably stow and carry over and above her cabin, tackle, apparel, provisions, and furniture, and, being so loaded, shall therewith proceed to Queenstown, Falmouth, or Plymouth, for orders to discharge at a safe port in the United Kingdom, or on the continent between Bordeaux and Hamburg, both included, (Rouen excluded,) also Holland excluded, or as near thereunto as she may safely get, and deliver the same, always afloat, on being paid freight as follows: six shillings and three pence sterling per quarter of 480 lbs. delivered, of wheat or maize, other grain or stowage goods to pay in full and fair proportion thereto as customary at loading port; ten per cent. extra if discharged on the continent as ordered from port of call in the United Kingdom as above; if ordered to a direct port of discharge on the continent as above, on signing bills of lading, the rate to be the same as to the United Kingdom for orders. In full of port charges and pilotages (the act of God, restraints of princes and rulers, the dangers of the seas and navigation, accidents to boilers, machinery, etc., always excepted),

freight being paid on unloading and right delivery of the
cargo, in cash, without discount or allowance. . . . Fifteen
(15) running days, (if the vessel be not sooner dispatched,) com-
mencing when vessel is all ready and prepared to receive cargo
and written notice thereof given to charterers, to be allowed
for loading and discharging vessel, and, if longer detained,
charterers to pay demurrage at the rate of forty (£40) pounds
British sterling, or its equivalent, per day. . . .

Geo. Blasse,
    Witness to the signature of       H. L. Gregg & Co.
                    By cable authority from T. H. Davison.

A. Albert,
    Witness to the signature of    A. Schumacher & Co."


On the 10th of September, 1879, the charterers filed a libel
*in personam*, in Admiralty, in the District Court of the United
States for the District of Maryland, against the owners of the
Whickham, to recover $2,000 damages for a breach of the
charter-party. The libel sets forth a copy of the charter-party,
as Exhibit A, and avers, that, on the 1st of August, 1879, the
libellants, "having previously made a contract, which required
them to ship during that month a cargo of grain to Europe,
and requiring a vessel for that purpose, communicated these
facts" to the agents of the respondents, and the charter-party
was made; that the vessel had not sailed from Benizaf at the
time of the execution of the charter-party, and was not then
about to sail therefrom; that, by reason of such breach of the
contract and warranty, and the delay in the arrival of the ves-
sel at Philadelphia, arising therefrom, the libellants were not
afforded an opportunity of loading the vessel with grain, either
in Philadelphia or Baltimore, during the month of August,
1879, and she did not in fact arrive in Baltimore until after the
expiration of that month, nor did she arrive in Philadelphia in
time to discharge her inward cargo and load with grain during
that month; that the respondents did not notify the libellants
of the arrival of the vessel in, and her readiness to receive
cargo at, Philadelphia; and that, in consequence thereof, the

libellants were compelled, at higher rates of freight, to charter another vessel for that purpose.

The respondents filed an answer, on the 1st of December, 1879, alleging that, at the time the charter-party was executed, the vessel was about to sail from Benizaf, within the meaning of its language; that she did, with all convenient speed, sail and proceed to Philadelphia, and there, without delay, discharge her inward cargo, and, as soon as discharged, proceed without delay to Baltimore, and was, without delay, tendered to the libellants to load according to the charter-party, and was refused by the libellants, for the sole cause, as alleged by them, that the respondents had broken the charter-party, because the vessel was not at Benizaf, about to sail, on the 1st of August, 1879; and that the libellants were aware of her arrival in Philadelphia, and of the time she finished the discharge of her inward cargo. The fact of the prior contract by the libellants to ship grain to Europe, and of the communication of knowledge thereof to the agents of the respondents, is put in issue. The answer also alleges, that it is not material or competent to prove the existence of such prior contract or knowledge of it by the respondents, or the inability of the libellants to fulfil it, or the chartering of another vessel.

On the same day, the owners of the vessel filed a cross-libel *in personam*, in Admiralty, in the same court, against the charterers, setting forth the charter-party, and alleging, that the vessel, at its date, was about to sail from Benizaf; that she did, in pursuance of the charter-party, proceed, with all convenient speed, to Philadelphia, with inward cargo, and, being discharged thereof, did, in accordance with the charter-party, proceed to Baltimore, and was ready to receive cargo from the charterers, of which written notice was given to them, but they, without cause, refused to receive and load the vessel, and repudiated the charter-party, on the sole ground, as by them alleged, that the vessel was not, on August 1, about to sail from Benizaf; and that the vessel, as soon as possible after such refusal, was re-chartered for a voyage from New York to Europe, at a freight less by $1,912.58, and with an increase of expense of $1,000 and more. The cross-libel claims $3,000 damages.

The answer to the cross-libel, filed in January, 1880, avers that the vessel had not sailed, and was not about to sail, from Benizaf, on the 1st of August, 1879, but, on the contrary, had not her cargo on board, and did not complete the loading of it till the evening of August 7, and did not sail from Benizaf till the evening of August 8; that, when she sailed from Benizaf, she was not provided, and in every way fitted, for the voyage, and did not proceed to Philadelphia or Baltimore with all convenient speed, but sailed without a supply of coal for the voyage, and stopped at Gibraltar to obtain a proper supply; that the charterers received no written notice of the vessel's arrival and readiness to receive cargo from them at Philadelphia; that she did not arrive in Philadelphia or Baltimore, and the charterers did not receive written notice of her readiness to receive cargo from them until it was too late for them to use the vessel for the purposes for which they had chartered her, which purposes they communicated to the agents of the vessel at the time the charter-party was executed; and that, in consequence of such delay and default, they were compelled, before the arrival of the vessel, to charter another in her place, at a loss of $2,000, and, when she did arrive, they refused to accept and load her.

It was stipulated between the parties, that the allegations made in the answer to the cross-libel should be treated as averments in the original libel, and that, under the answer to the original libel, any evidence might be offered, and any evidence taken, which might be admissible under any proper state of the pleadings.

Proofs were taken, and the District Court dismissed the original libel, and decreed a recovery of $4,093.18 in favor of the libellants in the cross-libel. 1 Fed. Rep. 178. The decision of the District Court proceeded on the ground that the words "about to sail with cargo," in the charter-party, meant that the vessel was to sail as soon as, with reasonable diligence, she could get her cargo on board.

The charterers appealed to the Circuit Court from the decrees. Further proofs were taken, and that court found the following facts:

"1. The British steamer Whickham, owned by T. H. Davison and others, th⁻ ᵈ⁻fendants in the original libel, sailed from Shields on the 9th of July, 1879, bound for Lisbon, where she arrived on the 16th, and, having discharged her cargo, sailed again in ballast, on the 23d, for Benizaf, on the coast of Morocco, to take a load of iron ore, under a charter for Philadelphia. She passed Gibraltar on the 25th, and arrived at Benizaf at 4.30 P.M. of Saturday, the 26th. She began taking in cargo under the charter for Philadelphia during the forenoon of Monday, the 28th. On that day she took on board 115 tons, and on the 29th about 90 tons; but on the 30th none; and on the 31st only four boat loads. During this time there was delay in delivering the cargo on board, as other vessels in port were entitled to precedence in loading. After the 31st the cargo was put on board with as much dispatch as could have been expected at that place, and it was all in on the 7th of August, at 5.30 P.M. An hour later the vessel sailed, and, stopping five hours at Gibraltar, for coal, on the 9th, arrived at Philadelphia on the 2d of September. She completed her unloading at that port on the 7th.

2. The usual cargo at Benizaf is iron ore. In loading, a vessel lies out in the stream about a quarter of a mile from the shore, and the ore is taken to her in small boats of from five to seven tons burden each. It is then passed up the ship's side in baskets. Two or three stages are put up between the boats and the ship's decks, and two men on each stage receive and pass the baskets. This is the only way of loading such cargo at that port.

3. About the first of August, Gregg & Co., a firm of ship brokers in Philadelphia, were authorized, by cable message from the owners in England, to get a charter for the Whickham, to carry grain from the United States, on her return voyage. Not being able to do this in Philadelphia, the firm, on the first of August, telegraphed Mr. Erickson, a ship broker in Baltimore, to look for a charter in that city. In their telegram it was said that the vessel 'had sailed, or was about to sail, from Benizaf, with cargo, for Philadelphia.' The precise form of the authority given by the owners to Gregg & Co. is no-

where shown from the evidence, further than may be inferred from the telegram to Erickson.

4. A short time before the first of August, Schumacher & Co., of Baltimore, the original libellants, employed Mr. Foard, another ship broker in that city, to procure for them a vessel to take a cargo of grain to Europe, which they were under contract to ship in August. He, finding that the steamers for that month were scarce, and hearing of the Whickham, took Mr. Erickson to the office of Schumacher & Co., and suggested that she might do. At the interview which then took place, it was understood by all parties that a vessel was wanted that could be loaded in August, and that no other would answer the purpose. Schumacher & Co., doubting whether the Whickham could arrive in time, wanted a guaranty that she would, but this was declined. All parties then made their calculations as to the probable time of her arrival, upon the basis of the language in the telegram, and finally Schumacher & Co. agreed to take her, first, however, providing that she might be loaded in Philadelphia or Baltimore, at their option, intending, if she did not arrive in time for Baltimore, to get her cargo, under their contract, in Philadelphia. In these calculations it was assumed by all that she would get away from Benizaf not later than the second of August, and that her voyage across would probably be about twenty days. This all occurred in Baltimore on the first of August, and it does not appear from the evidence that any of the parties, either in Philadelphia or Baltimore, knew anything of the movements of the vessel except as they were to be inferred from the telegram. There was no communication with Benizaf by telegraph, the nearest telegraphic station being at Gibraltar, which was a day's sail away.

5. As soon as the bargain was concluded, Erickson sent to Gregg & Co. for a charter-party in form. They immediately sent the draft of one, in which the vessel was described as 'sailed from, or loading at, Benizaf.' This Schumacher & Co. declined to accept, on the ground that their agreement was for a vessel that 'had sailed, or was about to sail, from Benizaf, with cargo, for Philadelphia.' This being communicated to

Gregg & Co., they at once sent forward a new draft, to meet the wishes of Schumacher & Co., and using the language they insisted upon. This new draft reached Baltimore on the second of August, and was duly executed by all parties. This is the instrument a copy of which is marked Exhibit A, and filed with the original libel. From this it appears, that, in the printed blank which was used, there were the following words: 'Charterers to have option of cancelling this charter-party should vessel not have arrived at loading port prior to ——.' These words were erased by drawing a pen through them, before signing

6. Schumacher & Co., having ascertained, on the 9th of August, that the steamer passed Gibraltar outwards from Benizaf on that day, and being then satisfied that she would not arrive in time to load, either at Baltimore or Philadelphia, in August, at once set about securing another vessel, and on the 16th got one, which they afterwards loaded at an increased cost of freight to them over what they would have been compelled to pay the Whickham, of one thousand nine hundred and eighty-eight $\frac{25}{100}$ dollars. It is agreed that this new charter was effected on as favorable terms as it could have been in the month of August, and that, if Schumacher & Co. are entitled to recover at all, it must be for the increase in the cost of freight which they paid.

7. The discharge of the cargo of iron ore from the Whickham was completed with dispatch, at Philadelphia, and on the 7th of September she sailed for Baltimore, where she arrived on the 9th, and was tendered Schumacher & Co., under the charter, on the 11th. They declined to accept her, for the reason that, as they claimed, when the charter-party was entered into, she had neither sailed nor was about to sail from Benizaf, within the meaning of that provision in the charter, as understood by the parties. Another charter was then obtained, but at a loss to her of four thousand and ninety-three $\frac{18}{100}$ dollars, as of May 10, 1880. It is agreed that this charter was as favorable as any that could have been effected, and that, if her owners are entitled to recover at all, it must be for the above amount, as their loss."

The Circuit Court stated the following conclusions of law:

"1. That the Whickham was not about to sail from Benizaf on the 1st of August, within the meaning of that term as used in the charter-party.

2. That Schumacher & Co. are entitled to recover from the defendants to their libel the sum of $1,988.25, and the interest thereon from September 11, 1879.

3. That the cross-libel of T. H. Davison and others must be dismissed."

A decree was entered in the two suits, reversing the decrees of the District Court, and adjudging a recovery of $2,128.07, with interest until paid, in favor of the charterers, and dismissing the cross-libel. 5 Hughes, 221, and 4 Fed. Rep. 346. The owners of the vessel have appealed to this court.

The decision of the Circuit Court proceeded on the ground that the language of the charter-party must be interpreted, if possible, as the parties in Baltimore understood it when they were contracting. In view of the facts, that all the contracting parties understood that the vessel was wanted to load in August, that, as soon as the charterers learned that she did not leave Gibraltar until the 9th, they took steps to get another vessel, and that they declined to sign a charter-party which described the vessel as "sailed from, or loading at, Benizaf," the court held that the language of the charter-party meant that the vessel had either sailed, or was about ready to sail, with cargo; and that the vessel was not in the condition she was represented, being not more than three-elevenths loaded.

The argument for the appellants is, that the words of the charter-party "about to sail with cargo" imply that the vessel has some cargo on board but is detained from sailing by not having all on board, and that she will sail, when, with dispatch, all her cargo, which is loading with dispatch, shall be on board; and that this vessel fulfilled those conditions. As to the attendant circumstances at Baltimore, it is urged that the charterers asked for a guaranty that the vessel would arrive in time for their purposes, and it was refused, and that the printed clause as to an option in the charterers to cancel was stricken

out, and that then the charterers accepted the general words used.

The words of the charter-party are, " now sailed, or about to sail, from Benizaf, with cargo for Philadelphia." The word "loading" is not found in the contract. The sentence in question implies that the vessel is loaded, because the words " with cargo" apply not only to the words "about to sail," but to the word "sailed," and as, if the vessel had " sailed with cargo," she must have had her cargo on board, so, if it is agreed she is "about to sail with cargo," the meaning is, that she has her cargo on board, and is ready to sail. This construction is in harmony with all that occurred between the parties at the time, and with the conduct of the charterers afterwards. The charterers wanted a guaranty that, even if the vessel had already sailed, or whenever she should sail, she would arrive in time for them to load her with grain in August. This was refused, and the charterers took the risk of her arriving in time, if she had sailed, or if, having her cargo then on board, she should, as the charter-party says, " with all convenient speed, sail and proceed to Philadelphia or Baltimore." Moreover, the charterers refused to sign a charter-party with the words " sailed from or loading at, Benizaf," and both parties agreed on the words in the charter-party, which were the words of authority used by the agents in Philadelphia of the owners of the vessel. The erasing of the printed words, as to the option of cancelling, was in harmony with the refusal of the owners to guarantee the arrival by a certain day. So, also, when the charterers learned, on the 9th of August, that the vessel did not leave Gibraltar till that day, they proceeded to look for another vessel. It was then apparent that the vessel had not left Benizaf by the 1st of August, or with such reasonable dispatch thereafter, that she could have had her cargo on board, ready to sail on the 1st of August.

That the stipulation in the charter-party, that the vessel is " now sailed, or about to sail, from Benizaf, with cargo, for Philadelphia," is a warranty, or a condition precedent, is, we think, quite clear. It is a substantive part of the contract, and not a mere representation, and is not an independent agreement,

serving only as a foundation for an action for compensation in damages.   A breach of it by one party justifies a repudiation of the contract by the other party, if it has not been partially executed in his favor.   The case falls within the class of which *Glaholm* v. *Hays*, 2 Man. & Gr. 257; *Ollive* v. *Booker*, 1 Exch. 416; *Oliver* v. *Fielden*, 4 Exch. 135; *Gorrissen* v. *Perrin*, 2 C. B. N. S. 681; *Croockewit* v. *Fletcher*, 1 H. & N. 893; *Seeger* v. *Duthie*, 8 C. B. N. S. 45; *Behn* v. *Burness*, 3 B. & S. 751; *Corkling* v. *Massey*, L. R. 8 C. P. 395, and *Lowber* v. *Bangs*, 2 Wall. 728, are examples; and not within the class illustrated by *Tarrabochia* v. *Hickie*, 1 H. & N. 183; *Dimech* v. *Corlett*, 12 Moore P. C. 199, and *Clipsham* v. *Vertue*, 5 Q. B. 265.   It is apparent, from the averments in the pleadings of the charterers, of facts which are established by the findings, that time and the situation of the vessel were material and essential parts of the contract.   Construing the contract by the aid of, and in the light of, the circumstances existing at the time it was made, averred in the pleadings and found as facts, we have no difficulty in holding the stipulation in question to be a warranty. See Abbott on Shipping, 11th ed. by Shee, pp. 227, 228.   But the instrument must be construed with reference to the intention of the parties when it was made, irrespective of any events afterwards occurring; and we place our decision on the ground that the stipulation was originally intended to be, and by its terms imports, a condition precedent.   The position of the vessel at Benizaf, on the 1st of August—the fact that, if she had not then sailed, she was laden with cargo, so that she could sail —these were the only data on which the charterers could make any calculation as to whether she could arrive so as to discharge and reload in August.   They rejected her as loading; but, if she was in such a situation, with cargo in her, that she could be said to be " about to sail," because she was ready to sail, they took the risk as to the length of her voyage.

*The decree of the Circuit Court is affirmed.*