GIUSEPPE et al. v. MANUFACTURERS' EXPORT CO.

(District Court, S. D. Alabama. June 19, 1903.)

No. 983.

1. SHIPPING—BREACH OF CHARTER PARTY—DELAY OF SHIP IN PROCEEDING TO PORT OF LOADING.

   Defendants chartered from the owners' agent in Mobile an Italian ship, to be loaded in Mobile. The charter party stated that she was then on passage from Sydney to Genoa, Italy, and stipulated that she should "proceed with all possible dispatch to port of loading to enter upon this charter." Defendants required the ship, not later than November, to carry a cargo they had sold, and relied on the agent's representation that she could reach there by that time. Nothing was said as to whether she was then carrying a cargo. She arrived in Genoa September 27th with a cargo of coal, and sailed from there for Mobile December 7th, not arriving until in the following March, when defendants refused to load her, having previously procured another vessel. The weight of evidence was that there were good facilities in Genoa for discharging coal, and that the ship in the usual course there should have discharged in from 10 to 14 days, and should have been ready to sail in from 10 to 12 days more. Held, that the provision that she should "proceed with all possible dispatch" was a warranty, and that her remaining in Genoa for 70 days was unusual and unnecessary, and, in view of the circumstances under which the charter was made, relieved defendants from the obligation to accept her when tendered.

In Admiralty. Action against charterer for breach of charter party.

Gregory L. & H. T. Smith, for libelants.
Pillans, Hanaw & Pillans, for defendant.

TOULMIN, District Judge. This is a suit by the owners of the
Italian ship Caldera to recover damages for an alleged breach of a
charter party. The charter party was made in Mobile, Ala., June 11,
1901, between G. Ivulich, the agent of the vessel, and the defendant.
The location of the vessel at the time was stated to be "now on a
passage from Sydney to Genoa, Italy." The charter party also con-
tained this stipulation: "Vessel to proceed with all possible dis-
patch to port of loading, to enter upon this charter."

The facts of the case, as I find them from a preponderance of the
evidence, are that in June, 1901, the defendant having made a sale
of lumber to Montevideo, to be shipped in October or November of
that year, and wanting a vessel for the shipment, G. Ivulich, as agent
for the ship Caldera, offered them that ship as a suitable one for the
cargo and for loading in November. The negotiations for the ship
were between said Ivulich on the one part, and J. T. McKeon, presi-
dent of the defendant company, and H. G. G. Donald, who was then
an officer of the company, on the other part, the result of which was
the charter party in question. Donald principally attended to the de-
tails of the charter party. In their negotiations the parties figured
on the length of time it would probably take the ship to reach Mobile,
calculating on her having then been about 10 or 12 days on the
passage from Sydney to Genoa. Her exact location was not known
to them at the time. Donald and McKeon understood from Ivulich's
representations that the ship was sailing from Sydney, Cape Breton,
in the Dominion of Canada. Donald and Ivulich in their negotia-
tions figured on that basis, and estimated that she would get to Mo-
bile by November, and for November loading. Nothing was said,
during the negotiations or at the time the charter party was executed,
about the ship having a cargo for Genoa. If Ivulich then knew that
she had a cargo, he did not know what kind of cargo it was, and
he did not mention the matter of cargo to either Donald or McKeon.
Under these circumstances the charter party was made.

It is true that Ivulich testified that he did not represent the ship as
sailing from Sydney, Cape Breton, and that he did not figure on the
time it would take her to get to Mobile on any such basis, nor did
he calculate on her reaching Mobile in November, or so represent;
that he figured on her sailing from Sydney, New South Wales, to
Genoa, and his estimate was that she would not reach Mobile under
eight or nine months. He also testified that he knew the ship had
cargo, and his recollection was that he at some time had told Donald
and McKeon that she perhaps had a cargo of jarra wood. But the
weight of the evidence is in conflict with the testimony of Ivulich
on all these points, except as to any express representation by him
that the ship sailed from Sydney, Cape Breton. I am not satisfied,
from the evidence, that he made any express representation as to
that; but his conduct implied it, and Donald and McKeon so under-
stood it, and I do not find that Ivulich at any time represented that
the ship sailed from Sydney, New South Wales. Donald, McKeon,

and Yonge (who was also an officer of the defendant company and who had some knowledge of the negotiations for the ship) testified to the effect that they had never heard that the ship was on a passage from Sydney, New South Wales, until in September, 1901, some three months or more after the charter party was made, and that they then learned it through the Maritime Register or some like source. They at once sought an interview with Ivulich and told him of what they had learned. While neither affirming nor denying the correctness of the information, he assured them that the ship would be at Mobile in November, and in time for the November loading. They further testified that they never heard, at that or at any other time, anything about a cargo of jarra wood, and that Ivulich made no such suggestion to them or in their hearing.

The evidence was that the ship did not arrive in Mobile until March, 1902, when the defendant notified the master of the ship that they would not load her under the charter party, because of the great delay in her arrival, owing to which the purposes for which she was chartered had lapsed. The defendant had taken another ship in the meantime to fill their contract. The evidence showed that an average trip for such vessel from Sydney, Cape Breton, to Genoa, and thence to Mobile, would be about 5 or 6 months, and that an average trip from Sydney, New South Wales, to Genoa is about 5½ months, and from Genoa to Mobile from 2½ to 3 months; that at the time this charter party was made the ship Caldera was running around Cape Horn with a cargo of 2,737 tons of coal, and that she reached Genoa on September 27, 1901, and sailed for Mobile on December 7, 1901; that for a vessel the size of the Caldera the time necessary to take ballast and to attend to ship's business at Genoa is usually 10 or 12 days.

The master of the ship testified that the usual time for discharging a cargo of coal at Genoa from a vessel like the Caldera, and to attend to her business, is not less than 2½ months; that there were no hoists or other machinery for discharging a cargo of coal there, and that such cargo had to be discharged by hand. It, however, appeared from the testimony of the master that in discharging the Caldera's cargo of coal at Genoa he sometimes discharged from one hatch and sometimes from two, and that she had three hatches, but that he did not discharge from more hatches because he had to discharge under his charter party, and he knew that the charterers would not receive more than he did discharge. The charter party called for discharging the cargo at 50 tons per day. The ship was at Genoa 2 months and 10 days. There was evidence on the part of the defendant that in the port of Genoa the facilities for discharging cargoes of coal are excellent and ample. There are hydraulic cranes and other equipments there as fine as any in the world; that cargoes of coal are usually discharged by these cranes, which are capable of discharging as much as 1,000 tons a day; and that 200 or 300 tons a day is the usual rate of discharging such cargoes.

"Time and situation of a vessel are materially essential parts of the contract of a charter party or affreightment." Gray v. Moore (C. C.) 37 Fed. 266; Lowber v. Bangs, 2 Wall. 732, 17 L. Ed. 768; Davison v. VonLingen, 113 U. S. 40, 5 Sup. Ct. 346, 28 L. Ed. 885. "The

place where a ship is, is a material point in making the charter party, for two reasons: The charterer learns what sort of a voyage the ship is about to make, and also how long it will probably be before the ship arrives. * * * The statement of the place of the ship is a substantive part of the contract. * * * This statement is a condition precedent." Benton v. Taylor, 7 Asp. 385. If there is a breach of this condition, the charterer has a right to treat the contract as at an end. Benton v. Taylor, supra.

It appears there are two well-known ports named Sydney—one in the Dominion of Canada, and the other in Australia. The charter party does not specify which one is referred to as the place from which the Caldera was on a passage to Genoa. It is well settled that a contract, where its meaning is not clear, is to be construed in the light of the circumstances surrounding the parties when it was made. It is always allowable to adduce oral or other extrinsic evidence of the surrounding circumstances under which a contract was made, so as to enable the court to place itself in the position of the parties thereto, to identify the persons and things to which it refers, and to see clearly what has been expressed in the instrument. From the view I take of this case, it is unnecessary to determine whether Sydney mentioned in the charter party referred to Sydney in Cape Breton, or to Sydney in New South Wales. Assuming that it referred to the former, and that there was a breach of that condition of the contract, because of the fact that the ship was on a passage from Sydney, New South Wales, and because of such breach the defendant had the right to treat the contract as at an end, yet when it learned that fact, and did not then choose to treat the contract as at an end, and so notify Ivulich, but led him to believe that it chose to treat it as still subsisting, relying on his assurances that the ship would nevertheless be at Mobile in November, I think it should be considered as having waived the breach.

The charter party stipulated the "vessel to proceed with all possible dispatch to port of loading, to enter upon this charter." "With all possible dispatch" is a warranty that she will so proceed. It is not a representation simply that she will so proceed, but a condition precedent to a right of recovery. Lowber v. Bangs, supra; Davison v. Von Lingen, supra. Where there is no express stipulation in a charter party as to time, the law implies a stipulation that there shall be no unreasonable or unusual delay in commencing the voyage, or, if it has been commenced, in the performance of it; and if the purposes of the charter party were altogether frustrated by the delay it is a defense to an action for nonperformance by the charterers. Olsen v. Hunter-Benn Co. (D. C.) 54 Fed. 530. In view of the circumstances under which the ship was chartered, and of the assurances of her agent, Ivulich, after it was known by the charterers that she was on a voyage from New South Wales, that she would arrive in Mobile in time for November loading, as originally contemplated, her delay at Genoa was not only unreasonable, but, upon the evidence in the case, I think unusual and unnecessary. Even if the charterers could be charged with notice that the ship was burdened with cargo to be discharged at Genoa, yet I am satisfied, from the evi-

dence, that her delay of 70 days there was unreasonable and unnecessary, and that she ought not to have consumed one-third of that time. Antola v. Gill (C. C.) 7 Fed. 487.

While my opinion is that the charterers were not bound by the undisclosed knowledge that the ship had cargo to be discharged at Genoa, the conclusion I have reached in the case renders it useless to discuss that proposition or give the reasons for my opinion on it. My judgment is that the charterers had the right to refuse to load the ship when tendered, and that the libelants are not entitled to recover.

The libel is therefore dismissed.