**COMMERCIAL UNION OF AMERICA, Inc., v. ANGLO–SOUTH AMERICAN BANK, Limited.**

(Circuit Court of Appeals, Second Circuit. January 10, 1927.)

No. 130.

1. **Banks and banking ☞191—Letter of credit covering shipment by steamer "sailing during first half of November" held to require that steamer break ground during that period.**

Letter of credit, covering sugar to be shipped "by steamer * * * sailing during the first half of November," *held* to require the ship to actually break ground during that period, as against claim that it was sufficient if it was expected or scheduled to leave within such time.

2. **Banks and banking ☞191—Letter of credit, construed as requiring shipment on steamer scheduled to sail before certain time, held not complied with.**

Letter of credit, covering sugar to be shipped "by steamer * * * sailing during the first half of November," if construed only to require that steamer be expected or scheduled to sail within such period, *held* not complied with by letter showing only that on November 4th the steamer was expected to sail on the 13th.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Commercial Union of America, Inc., against the Anglo-South American Bank, Limited. Judgment dismissing complaint after directed verdict, and plaintiff brings error. Affirmed.

See, also, 10 F.(2d) 937.

The plaintiff sued the defendant, a bank, in contract on a letter of credit written on October 22, 1920, in the following form: "In accordance with cable instructions received from our Barcelona Branch, we open a confirmed credit in your favor for $44,800, available by your presenting to us the undermentioned documents covering your shipment of 200 tons * * * sugar * * * shipped c. i. f. Barcelona, by steamer, first classification, direct from New York to Spain, sailing during first half of November, 1920, for account of Salvado Compania." The documents described were (1) clean bills of lading indorsed in blank; (2) invoices; (3) insurance certificates.

The plaintiff, the seller, selected the steamer, Cabo Creux, which her agents first told them would sail on November 9th, and later on November 13th, and loaded her with 202 tons 1,313 pounds of the requisite sugars, taking a bill of lading in proper form. This, with accompanying documents in order, they delivered to the defendant on November 13, 1920, a Saturday, after 12 o'clock. Along with these they inclosed a letter from the New York agents of the Cabo Creux, dated November 4th, saying that the ship "is expected to sail on November 13th," and a draft on the defendant in the plaintiff's favor for $45,379.99. A covering letter also went along, in which they offered to guarantee the defendant for the excess in the draft of $579.99, this being the contract price for the overplus of 2 tons 1,313 pounds.

The defendant on Monday morning, the 15th, telephoned the ship's agents, and learned that she would not sail till the 17th. They thereupon returned the documents to the plaintiff with three objections: First, because of the overdraft of $579.99; second, because of the overshipment of 2 tons 1,313 pounds; third, because the Cabo Creux would not sail within the period limited in the credit. The plaintiff received back the papers early enough to present a second draft for $44,800 on Monday, but did nothing that day. On this refusal to accept the draft, suit was brought for an amount representing the plaintiff's loss on a resale of the sugars in Spain.

On November 4th, the plaintiff being in doubt as to the meaning of the phrase, "sailing during the first half of November," had telephoned the defendant to ask its understanding. The evidence at the trial was contradictory as to the ensuing talk, but, in view of the fact that the District Court directed a verdict, it will be necessary only to give the plaintiff's version. This was that the defendant agreed to accept the documents, if presented "with assurance that the steamer is scheduled or expected to sail the first half of November." The single witness to this agreement repeated his testimony several times, sometimes using the word, "statement," or "indication," instead of "assurance." His last version was this: "Provided you had a statement from us that the steamer would sail, or you could satisfy yourself that the steamer was expected to sail."

After receiving the letter of November 4th, and about the 9th, the plaintiff spoke to the agents as to the ship's sailing date, and was again told that she would probably sail on the 13th, but at any rate on the 15th. This talk they did not, however, communicate to the defendant.

George Zabriskie, Franklin F. Russell, Melber B. Chambers, and Zabriskie, Sage, Gray & Todd, all of New York City, for plaintiff in error.

Appleton, Rice & Perrin, of New York City (Edwin T. Rice, of New York City, and Donald H. Starks, of New York City, of counsel), for defendant in error.

Before MANTON and HAND, Circuit Judges, and CAMPBELL, District Judge.

HAND, Circuit Judge (after stating the facts as above). [1, 2] It appears to us impossible to construe the phrase, "sailing during the first half of November," otherwise than as meaning that the ship shall break ground during that period. The alternative urged by the plaintiff is that it meant "expected or scheduled" to sail. Now it is quite true that, especially in reference to a named ship, at times we use the phrase as meaning no more than that she is so scheduled, as, for example, when we say, "The Berengaria, sailing next month." We need not decide what would have been the meaning of the phrase if the Cabo Creux had been named in the letter. It was not; no ship was named. The stipulated ship was described only by her voyage and her sailing date. The plaintiff could have delivered to a casual tramp, as well as to a line which had a schedule; indeed, the Cabo Creux, for all that appears, may have been a tramp.

Even under the canon contra proferen-

tem, the context precludes the plaintiff's construction. "Scheduled" would be at best inappropriate for a vessel which sails when she is laden and has no fixed dates. On the other hand, to make the expectation of her master or her agents the measure of the seller's obligation would impose upon the buyer an unreasonable latitude of performance. In the first place, the expectation itself varies as the lading proceeds, an obvious enough fact which this record illustrates. When is it to be taken? Surely not before the ship lifts the parcel sold; almost as certainly not before the seller tenders the documents. The last would alone answer the defendant's needs in the case at bar, because, on the 15th, there could be no expectation that the Cabo Creux would sail that day.

Moreover, not only is the standard itself too uncertain, but, if once fixed, it exposes the buyer to delays which we have every reason to assume he did not intend to accept. He did not choose the ship, but the seller. He did not decide when she should lift the parcel, whether early in her lading or late. He could not know whether she had fixed a full cargo, or must wait to fill. These contingencies might defeat the most honest expectations when the documents were tendered. Was he to bear them? True, he did accept the risks of wind and weather, slight in these days of steam, but it would be an unreasonable wrench of his words to suppose that he assumed so much more. This was a commercial contract, where time was of the essence. At least in charter parties, the sailing date is a condition precedent (Davison v. Von Lingen, 113 U. S. 40, 49, 5 S. Ct. 346, 28 L. Ed. 885; Glaholm v. Hays, 2 Man. & Gr. 257), and because the breach is thought vital. We may not play fast and loose with the words used, and yet hold the parties so straitly. So far as there is a difference between the buyer's position and the writer's of a credit, the defendant has the advantage. Old Colony Trust Co. v. Lawyers' Title & Trust Co., 297 F. 152 (C. C. A. 2).

So much granted, the result follows. We take the plaintiff at its word, and we do not stop to inquire whether the talk controlled the meaning which, without it, we should impute to the written words. Even so, the supposed condition was never fulfilled. The plaintiff was to "assure," or "state," or "indicate," to the defendant that the ship would sail on or before the 15th. All it did was to send a letter to the local agents, 11 days old when received, that at that time they had expected her to sail on the 13th. It is

true that they had made later inquiry on the 9th to learn whether that expectation was to be realized, but none thereafter. Had they inquired on the 13th, they must have learned that she would not sail that day or on the 15th. Such a letter was certainly not within the words which the plaintiff put in the defendant's mouth. At worst it was entitled to the best guess made at the time when the documents were tendered. No jury should have been allowed to say that the supposed agreement was satisfied by anything which the plaintiff presented.

But we go further. Even if it be thought that the letter of November 4th was enough, taken alone, certainly it did not preclude inquiries by the defendant. It would be intolerable to submit it to whatever might satisfy the plaintiff, reasonably or not. On the 15th, mere inquiry by telephone disclosed that the Cabo Creux was not to sail that day, or indeed the next. Had it used the most ordinary diligence, the plaintiff could not honestly have told the defendant on the 15th that the ship was to sail. Its sluggishness does, indeed, absolve it of bad faith, but cannot serve as a substitute for what the reasonable intendment of the words demanded.

We need not, therefore, consider whether the overdraft was in any case fatal to the plaintiff's case, or the overshipment. It is enough that the ship did not sail, and that the plaintiff, when it presented the papers, did not and could not assure the defendant that she would. The issue as to the overdraft was irrelevant to the case, and the court had no choice but to direct the verdict.

Judgment affirmed.