**WHITLOCK & ASSOCIATES, INC., and L. E. Whitlock, Appellants,**

v.

George **AARON**, Jack Miller, Houston B. Hill, J. D. Kennedy and Frank C. Ryburn, Appellees.

No. 8688.

United States Court of Appeals Tenth Circuit.

Aug. 30, 1967.

Rehearing Denied Oct. 18, 1967.

Emmet A. Blaes, of Jochems, Sargent & Blaes, Wichita, Kan. (James A. Kilgore, of Kilgore & Kilgore, Dallas, Tex., and Bruce W. Zuercher, Wichita, Kan., with him on the brief), for appellants.

Harold Hoffman, of Wynne, Jaffe & Tinsley, Dallas, Tex. (Robert C. Foulston and Malcolm Miller, of Foulston, Siefkin, Powers, Smith & Eberhardt, Wichita, Kan., and Morris I. Jaffe, Dallas, Tex., with him on the brief), for appellees.

Before MURRAH, Chief Judge, and PICKETT and BREITENSTEIN, Circuit Judges.

PICKETT, Circuit Judge.

This action arose out of an alleged breach of a Texas contract wherein appellants agreed to purchase from the appellees[1] 1513 acres of land known as the "Jenkins tract", together with an option held by the sellers to acquire an additional 1320 acres referred to as the "Schenkel tract", all located near and annexed to the city of Dallas, Texas. The property was principally suitable for the production of sand and gravel. Prior to the production of sand and gravel from the property, it was necessary that a permit from the city of Dallas be obtained, and the contract of purchase contained this provision:

"That with respect to the respective tracts, Jenkins Tract Sellers and Schenkel Option Sellers agree to obtain the necessary governmental permits allowing licensing and permitting Purchasers to mine, develop and exploit the gravel, sand, dirt and other minerals in said tracts, it being expressly understood that Purchasers will need said permits at least 30 days prior to the closing of this transaction in order to obtain the financing for said purchase. In the event the obtaining of such permits is delayed for any reason, all parties hereto agree that the closing date of this transaction as hereinafter set forth shall be extended until such permits are obtained, but not beyond an extension of sixty (60) days."

The contract was executed on March 22, 1963, and by agreement the parties fixed July 21, 1963 as the closing date. The expiration date of the Schenkel option was midnight July 15, 1963. During the afternoon of July 15, Whitlock, who was President of appellant Whitlock & Associates, Inc., notified the sellers that the purchasers were rescinding the contract for the reason that the required mining permit had not been obtained. At approximately the same time on July 15, the Dallas City Council adopted a resolution directing the issuance of the permit, with certain limitations. The trial court held that the sellers had complied with the contract provisions and that the purchasers' refusal to perform was a breach of the contract, which entitled sellers to a judgment for the full amount of their damages, although it was contended that the agreement contained a provision for liquidated damages. Judgment was entered accordingly.

On appeal it is contended that the sellers had failed to comply with the contract in a number of respects, but the record

---

1. The appellants are referred to herein as "purchasers"; the appellees as "sellers."

discloses that the primary reason for the withdrawal was the failure to obtain a mining permit satisfactory to those who were to finance the purchasers. At no time prior to the purchasers' withdrawal from the contract had any objection been made to the property title, and the evidence was without conflict that the sellers could have delivered a good and marketable title to the property. The written notices gave only the lack of an acceptable sand and gravel permit on the Schenkel tract as reason for the abandonment of the contract. No question is raised as to compliance or non-compliance with the contract provisions insofar as they pertain to the Jenkins tract. Whitlock testified that "Even though the contract provided we should have the permit, if we could have arranged the proper financing, we would have gone ahead with the deal right up to the last day."

The trial developed an extensive record, but the facts relating to the application to the Dallas authorities for a mining permit on the Schenkel tract are uncomplicated and not in material dispute. In 1962, after the sellers had acquired the Schenkel option, an application was made to the Dallas City Council for a mining permit on a portion of that property.[2] The council was favorably disposed to approve the application until objections were raised by residents of a nearby area. It was feared that the gravel removal would adversely affect the underground water supply of this area. After numerous meetings with residents of the area in question and with city authorities, it was indicated that the permit would be granted only upon a deposit with the city of $42,000 by the applicants, which was to be used to pay the cost of installing pipe lines for the delivery of city water to the complainants. Action on the application was delayed while unsuccessful attempts were made to avoid the cash deposit requirement. Whitlock was fully aware of this difficulty and testified that he had offered the services of his attorney to assist in arriving at a solution. On July 8, 1963, the City Council approved the application for a special permit and referred the matter to the City Attorney with instructions to prepare the necessary resolution.

When the expiration date of the Schenkel option was near, the sellers were concerned as to whether the purchasers intended to consummate the transaction. Whitlock, on numerous occasions, advised them that he had arranged for the financing and was ready to close prior to the expiration of the Schenkel option.[3] All

---

2. The terms and provisions of such permits were not standard, but were ordinarily "tailored to the particular situation presented by the location of the property." They were usually referred to in city proceedings as "Occupation Certificates."

3. Referring to a telephone conversation he had with Whitlock on July 11, Hill, one of the sellers, testified:
"Then I asked him, I said, 'Now, Mr. Whitlock, I want to be sure that you are going to be able to close on that date because, you know, the option on the Schenkel tract expires on midnight, July 15th 1963. And if you don't go through with it we would have no way of protecting ourselves and no way of taking care of it and should I have anybody trying to stand by as a last resort? He said, 'You need not be concerned about that. We have this all worked out. All you have to do is just be down here for the closing.' This was on July 11, approximately four days before the date that the option was due to expire. It was approximately ten days before the closing date as was extended in writing in the telegram that is an exhibit in this case. At that time Mr. Whitlock did not say anything to the effect that 'you haven't got us a gravel permit on the Schenkel tract within thirty days prior to closing and you are required to do that, so just forget about it, the deal is off.' Prior to that conversation, I tentatively explored the possibilities of having someone stand by in case the Whitlocks didn't go forward with this thing to the extent that we had inquired of Leonard Whitlock and his Associates if they were going to be able to go through with it. They had assured us all the way that they already had their financing but that they were trying to get a cheaper financing on the acquisition of this money. It wasn't a problem of getting the financing on it; it was a problem of getting cheaper financing. After that conversation on

the interested parties, including representatives of those who were to finance the purchasers, were in Dallas on July 15. All of them knew that the Schenkel option would expire at midnight on that date. All of them knew that the entire deal would collapse if the option were not exercised. The contract required the purchasers to "exercise their right of purchase of the Schenkel Tract under the option to so purchase. * * *" Between 9 and 10 A.M. on July 15, the purchasers advised the sellers to notify Schenkel that the option would be exercised on that day. There was no indication that the purchasers did not intend to perform until mid-afternoon of that day, when notice of withdrawal was served on the sellers, giving as a reason the failure to obtain a satisfactory mining permit. The resolution which had been adopted by the Dallas City Council directed that upon the deposit of $42,-000.00 a 5-year permit be issued with the right of renewal in the discretion of the council. The resolution further provided:

> "Section 6. At the cessation of the mining operation or as soon thereafter as is reasonably practicable, the applicants agree that the excavations that shall have been made by reason of the mining operations will be refilled with 'sanitary fill' to conform with the standard specifications as certified by the Public Works Director of the City of Dallas. If for any reason the sanitary fill cannot be negotiated with the City, then the applicants or their assigns shall fill or cause to be filled the excavations with residual overburden, so as to restore the property as near as possible to its original status and condition."

The uncontradicted testimony is that the sellers were ready and able to pay the $42,000.00 deposit on July 15, 1963, and were prepared to furnish the required title insurance.

The Connecticut Mutual Life Insurance Company had committed itself to finance the purchasers, provided that the production contract between the purchasers and Texas Industries, Inc. were executed. The record is clear that on the final day it was Texas Industries which became dissatisfied with the terms of the permit and determined not to enter into the production contract under a 5-year permit without the right to automatically renew it and without a separate contract for the City of Dallas to refill the excavations with sanitary fill.[4]

 The contract did not provide that the permit should be for any particular time, or that sellers would acquire a contract with the City of Dallas to fill the excavations created by the removal of the gravel with sanitary fill, or that the permit would not require such excavations to be refilled by the permittee or its assigns. We agree with the trial court that the 5-year permit with the discretionary right of renewal is a governmental permit as contemplated by the contract. While the permit is for the purpose of mining only sand and gravel from the property, with no reference to "dirt or other minerals" as stated in the contract, there is no evidence that the permittee could not remove dirt and other minerals if any were found on the property. In any event, objection on this ground is raised for the first time on appeal, and comes too late.

 The purchasers attempted to establish that during negotiations to obtain the necessary financing after the

---

July 11, 1963, I did not make any effort to have anyone stand by to exercise the Schenkel Option in case this deal fell through. I was lulled into the feeling of security that everything was all right."

4. In a letter written by an attorney for the purchasers on July 15, after relating objectionable features of the action taken by the City of Dallas in authorizing a

mining permit on the Schenkel tract, it was stated: "These facts, which were discovered for the first time at approximately 10:30 A.M. today, so increased the burdens of the mining operation as to make it unattractive to Texas Industries, Inc., and they withdrew a proposed contract which would have been most favorable to Whitlock Associates."

execution of the contract, Aaron, one of the sellers, had stated that he could obtain a 10-year permit from the city and that the city would be desirous of giving the purchasers a sanitary fill contract for the Schenkel tract. Aaron denied making these statements. In any event, the contract contains no such requirements, and under Texas law "A contract must be interpreted according to the intention of the parties at the time it was made and not in the light of events occurring thereafter." McCain v. Giersch, 5 Cir., 112 F. 2d 70, 72; see also Davidson v. Von Lingen, 113 U.S. 40, 5 S.Ct. 346, 28 L.Ed. 885; Portland Gasoline Co. v. Superior Marketing Co., 150 Tex. 533, 243 S.W. 2d 823; Burtis v. Butler Bros., Tex.Civ. App., 228 S.W.2d 938; Zephyr Oil Co. v. Cockburn, Tex.Civ.App., 215 S.W.2d 647; Gardner v. Smith, Tex.Civ.App., 168 S.W.2d 278.

There was evidence that after the signing of the contract, the purchasers would have been satisfied with a 5-year permit, and it was not until Texas Industries, at the very last moment, concluded that it could not live with such a short period, that the 10-year provision was demanded. We agree with the trial court's determination that the term "permit", as used in the contract, should not be construed as requiring a permit term of not less than 10 years. Nor are the purchasers in a position seriously to assert as grounds for their withdrawal the contract provision relating to the need of a permit 30 days prior to the closing date. The trial court concluded, and we agree, that the purchasers, by representing their willingness to proceed with the deal until a few hours before the expiration of the option, waived any rights they may have had relative to the 30-day provision.

The contract provided:

"* * * Should the Purchasers fail to consummate this Contract as specified for any reason, except title defects, [or failure of the sellers to comply with the requirements herein stated,] Sellers shall have the right to retain the earnest money payments made to them as liquidated damages for the breach of this contract and may pursue their rights for specific performance, [it being understood that said Fifty Thousand Dollars ($50,000.00) would be a credit against any suit for specific performance of said contract.]

The court awarded damages in the sum of $215,610.00. It is contended that the foregoing provision limited the recovery to the $50,000.00 earnest money payment in case of a breach by the purchasers. The trial court found that the $50,000.00 provision was not a reasonable forecast of the damages to be expected from a breach by the purchasers and was therefore not enforceable under Texas law. A contract provision for liquidated damages will be enforced in Texas only if there is a reasonable approximation between the stipulated sums and the actual loss. Stewart v. Basey, Tex.Civ.App., 241 S.W.2d 353, aff'd 150 Tex. 666, 245 S.W.2d 484; Kelly v. Cochran County, Tex.Civ.App., 50 S.W.2d 848, rev'd on other grounds, 125 Tex. 424, 82 S.W.2d 641; Kelsey v. Blackman, Tex.Civ.App., 293 S.W. 199. "Notwithstanding a sum mentioned in a contract be called liquidated damages, the courts will not so treat it, unless it bears such proportion to the actual damages that it may reasonably be presumed to have been arrived at upon a fair estimate by the parties of the compensation to be paid for the prospective loss." Kelsey v. Blackman, supra at 202. In determining whether to enforce a contract provision for liquidated damages the courts are to consider "the nature of the contract, its terms, the consequences that would arise from its breach and the circumstances of the transaction." Stewart v. Basey, supra, 241 S.W. 2d at 356. See also, Palestine Ice, Fuel & Gin Co. v. Walter Connally & Co., Tex. Civ.App., 148 S.W. 1109. The contract price for the Schenkel option was $354,-920.00. The court determined that it was essentially worthless at the time of the breach due to the short time remaining for the sellers to take advantage of it. The contract price for the Jenkins tract was $1,286,050.00. The court determined that this property was worth

$1,210,400.00 at the time of the breach. We cannot say that the court's finding that as a result of the breach the sellers were damaged in the net sum of $164,960.00 for loss of the Schenkel option, and $50,650.00 for the failure to purchase the Jenkins tract, is clearly erroneous; nor can we say that under the circumstances the court's finding that the $50,000.00 provision for stipulated damages was not a reasonable forecast of the actual damages suffered was clearly erroneous.

Although the purchasers claim that the sellers were in default of other requirements of the contract which justified the rescission, the case was tried primarily on the issue of the sufficiency of the mining permit granted for the Schenkel tract. The trial court, in its "Conclusions of Fact and Law" stated:

> "IV. As a matter of fact and law, defendant Whitlock, in withdrawing from the contract, relied solely on his opinion that plaintiffs had not furnished a permit on the Schenkel Tract. Defendants waived all other possible justifications for withdrawing from the contract. And we note in passing that defendants with admirable candor do not seriously assert any other ground for withdrawing."

We have given consideration to these contentions and have found them to be without merit.

Affirmed.

ON PETITION FOR REHEARING

Appellants urge that the court misapplied the Texas law as it relates to the validity of contractual provisions for liquidated damages. It is said that in Stewart v. Basey, 150 Tex. 666, 245 S.W. 2d 484, Texas adopted Section 339 of the Restatement of Contracts, abandoning a former rule of reasonable approximation between stipulated damages and the actual loss. The trial court here applied the "reasonable forecast" concept of the Restatement rule and the record does not disclose that the damages were incapable or very difficult of accurate estimation.

Rehearing denied.