**OCEAN CARGO LINES, LTD., as Owner of the S.S. Atlantic Sun, Libelant,**

**v.**

**NORTH ATLANTIC MARINE CO., Inc. and The Sub-Freights of the S.S. Atlantic Sun, Respondents,**

**and**

**Texaco, Inc., Claimant.**

**TEXACO, INC., Libelant,**

**v.**

**The Sub-Freights of the S.S. ATLANTIC SUN, Respondent.**

United States District Court
S. D. New York.

March 24, 1964.

Zock, Petrie, Sheneman & Reid, New York City, for the libelant-owner, Ocean Cargo Line, Ltd.; Howard M. McCormack, New York City, of counsel.

Boal, McQuade & Fitzpatrick, New York City, for the claimant-libelant, Texaco Inc.; Arthur M. Boal, Jr., New York City, of counsel.

FEINBERG, District Judge.

This case involves the assertion of competing maritime liens against the same fund. The proceeding was commenced by the filing of a libel in rem by Ocean Cargo Line, Ltd. ("Shipowner"), owner of the S.S. Atlantic Sun ("Atlantic Sun"), to enforce a maritime lien for unpaid charter hire due under a time charter with North Atlantic Marine Co., Inc. ("Charterer") for an amount in excess of attached subfreights of $6,053.81.[1] Subsequently, Texaco Inc. filed a libel against the same subfreights, claiming a maritime lien, also in excess of the attached subfreights, for bunkers (fuel oil) furnished at Port of Spain, Trinidad to the Atlantic Sun.[2]

Most of the basic facts giving rise to the competing liens asserted by Shipowner and Texaco are not in dispute. On November 2, 1959, Charterer entered into a voyage charter for carriage of a cargo of wheat from Houston, Texas to Rio de Janiero and/or Santos, Brazil.[3] On November 25, Charterer nominated the Atlantic Sun as the vessel to perform under the voyage charter.[4] This ship had, in turn, been chartered from Shipowner under the terms of a time charter,[5] dated November 20,[6] and was delivered to Charterer at 9:00 A.M. on December 10.[7]

After loading was completed, the Atlantic Sun sailed from Houston and arrived at Port of Spain, Trinidad to take on bunkers that Charterer had requested from Texaco via telephone on December 18. The bunkers were furnished on December 20 and 21,[8] pursuant to directions received from Charterer's agents at Trinidad who had been informed by the ship's master of the quantity required.[9] The reasonable value of the bunkers is $11,844.35, for which Texaco has not been paid.[10] On December 26, a semi-monthly installment of hire in the amount of $21,621 became due and payable to Shipowner under the terms of the time charter.[11] This installment remaining unpaid, Shipowner, at 9:45 A.M. on January 8, 1960, served written notice

1. The attached subfreights represent the final 10% owing to Charterer from a sub-charterer under a voyage charter, and were paid over to Shipowner who is presently holding this fund pending determination of the rights to these subfreights of the parties to these suits.

2. Stipulation of Facts [hereinafter cited as "Stip."], para. 17.

3. Stip., para. 7.

4. Exhibit C, introduced by stipulation [hereinafter cited as "Stip. Exhibit"].

5. The time charter was expressed to be for "a Brazilian round trip with Charterers option to proceed via Continent." Stip. Exhibit E. Although incorporating so much of the essential character of a voyage charter as to make the described voyage the paramount feature, this type of contract is treated as a time charter in all other respects. As to the duration

of such a charter, the parties are regarded as having agreed that the ship shall be employed in actually going on the round voyage, not for the time usually or reasonably occupied on such a voyage. Carver, Carriage of Goods by Sea 256–57 (10th ed. 1957).

6. Stip., para. 10; Stip. Exhibit E.

7. Stip., para. 14; Ocean Cargo Exhibits H–1, H–2. An addendum to the time charter changed the port of delivery from New York to Houston. Ocean Cargo Exhibit E–1.

8. Stip., para. 17.

9. Stip., para. 16; see Stip. Exhibit G.

10. Stip., paras. 18, 21.

11. On December 17, a libel in rem was filed by Shipowner against subfreights representing the first installment of 90% due and payable to Charterer under the

upon Charterer—the vessel by this time having arrived at Santos, Brazil—that unless the hire due December 26, 1959 was received by noon that day, Shipowner would withdraw the vessel from service "on completion of discharge. * * * "[12] On January 11, 1960, the next installment of charter hire accrued. On January 14, Charterer filed a petition in this Court for an arrangement, and was adjudicated a bankrupt on March 1, 1960.[13] Neither the December 26 nor the January 11 installment was paid. Discharge of cargo was completed at 6:30 P.M. on January 20.[14] Shipowner rechartered the Atlantic Sun, and received from the new charterer the sum of $7,900 for fuel oil on board at the time of delivery of the vessel to the new charterer, at 6:30 P.M. January 20.[15]

## I

### Validity of Texaco's Lien

Texaco's primary reliance is on the Maritime Lien Act (the "Act"), 46 U. S.C. §§ 971–975, which gives a maritime

lien to "[a]ny person furnishing * * * supplies * * * to any vessel * * * upon the order of the owner of such vessel, or of a person authorized by the owner. * * *." 46 U.S.C. § 971.[16] The Act also provides that a ship's master "shall be presumed to have authority from the owner to procure * * * supplies * * *." 46 U.S.C. § 972.[17] It is Texaco's contention that the master of the Atlantic Sun on the voyage in question "participated" in procuring the bunkers and that, therefore, the fuel for which it claims a lien was furnished upon the order of one having presumptive authority under the statute.

However, the Act also provides that "nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, * * * the person ordering the * * * supplies * * * was without authority to bind the vessel therefor." 46 U.S.C. § 973.[18]

voyage charter, but was discontinued on December 28, after the amounts owing to Shipowner had been paid. Stip., para. 13; Transcript [hereinafter cited as "Tr."], pp. 35–39. Texaco contends that Shipowner, by having discontinued its suit, rather than amending its libel to include the amount due on December 26, waived its rights to the subfreights attached in this suit.

The general rule is that if a contract provides for the payment of money in installments, an action will lie for each installment as it falls due. A judgment or discontinuance of one of these actions does not bar the maintenance of others for sums accruing subsequent to the date of filing the first action. See 4 Corbin, Contracts § 948 (1951).

12. Stip., para. 22; Ocean Cargo Exhibit I.

13. Stip., para. 4.

14. Tr. p. 46 (stipulation).

15. Stip., para. 23.

16. "§ 971. Persons entitled to lien
"Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel,

or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel. June 5, 1920, c. 250, § 30, Subsec. P, 41 Stat. 1005."

17. "§ 972. Persons authorized to procure repairs, supplies, and necessaries
"The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel. June 5, 1920, c. 250, § 30, Subsec. Q, 41 Stat. 1005."

18. "§ 973. Notice to person furnishing repairs, supplies, and necessaries
"The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but nothing in this chapter shall be con-

■■ Clause 18 of the time charter in the instant case contains a standard prohibition of lien clause providing as follows:

"Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel."

It is clear that when services are furnished on the order of a charterer or his agent, the materialman is charged with notice of the charter's existence and of the terms of the charter even though there may have been nothing to put him on notice as to its existence, unless he can show that even by the exercise of reasonable diligence he could not have discovered the true ownership of the vessel. United States v. Carver, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361 (1923); see Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 275, 60 S.Ct. 937, 84 L.Ed. 1197 (1940); Schilling v. A/S D/S Dannebrog, 320 F. 2d 628, 632 (2 Cir. 1963); Tampa Ship Repair & Dry Dock Co. v. Esso Export Corp., 237 F.2d 506, 507 (5 Cir. 1956). In Carver, supra, the Supreme Court declared with regard to the meaning of the language of Section 973 quoted above (260 U.S. at 489, 43 S.Ct. at 182, 67 L.Ed. 361):

"We regard these words as too plain for argument. They do not allow the

strued to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor. June 5, 1920, c. 250, § 30, Subsec. R, 41 Stat. 1005."

19. Stip., para. 16 recites:
"That on December 18, 1959 TEXACO INC. received by telephone a request from NORTH ATLANTIC MARINE CO., INC. [Charterer] to supply bunkers of an unspecified quantity to the S.S. ATLANTIC SUN. Thereafter, pursuant to directions received from Alstons Ltd. [Charterer's agent in Trin-

material-man to rest upon presumptions until he is put upon inquiry, they call upon him to inquire. To ascertain is to find out by investigation. If by investigation with reasonable diligence the material-man could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms."

Some doubt has been expressed as to whether a materialman is charged with notice of a charter's existence when supplies are furnished on the order of a master appointed by the owner, rather than on the order of a charterer. See Gilmore and Black, Admiralty 556-57 (1957). However, it is not necessary to decide that question here since I find that the bunkers in the instant case were furnished upon the order of Charterer. The only role played by the master in the procurement of the bunkers was to furnish Charterer's agent in Trinidad with specifications as to the quantity of fuel required and to sign the bunker receipt.[19]

I also find that at the time the Atlantic Sun arrived at Port of Spain, there was aboard a copy of the time charter dated November 20, 1959, containing the prohibition of lien clause referred to

idad] and specifications as to the quantities to be received being furnished by the officers of the S.S. ATLANTIC SUN bunkers were delivered by TEXACO INC. to the S.S. ATLANTIC SUN as set forth in paragraph No. 16 [sic]."
See also Stip. Exhibit G; Ocean Cargo Exhibit O. The bunkers were invoiced to the "M/V ATLANTIC SUN and/or Owners, and/or Operators, North Atlantic Marine Company, 80 Broad Street, New York, N.Y.," and the bunker receipt was made out to "Owner/Operator/or Account North Atlantic Marine Corp." Ocean Cargo Exhibits N, N-1. Texaco relies on W. G. Coyle & Co. v. North American S.S. Corp., 262 F. 250, 255 (5 Cir. 1920), but in that case the request that bunkers be furnished the vessel was not made by the charterer.

above,[20] but that no employee, officer or agent of Texaco inquired into the existence of a charter or attempted in any other way to ascertain the ownership of the vessel.[21] That the copy of the charter carried aboard the vessel may have been unexecuted, as Texaco maintains,[22] is immaterial. It is questionable whether the failure of the vessel to carry any copy of the charter relieves the materialman of his obligation to inquire into the ownership of the vessel, see Lindbar, Inc. v. St. Louis Fuel & Supply Co., 276 F.2d 882, 885–86 (6 Cir. 1960); United States v. Daniels Towing & Drydock, Inc., 214 F.2d 501, 502–03 (5 Cir. 1954); The Kongo, 155 F.2d 492, 495–96 (6 Cir. 1946); Gilmore and Black, op. cit. supra at 567, but, in any event, the presence aboard the Atlantic Sun of an unexecuted copy of the charter party containing the prohibition of lien clause was sufficient to place the burden of inquiry upon the materialman Texaco, see United States v. Robins Dry Dock & Repair Co., 13 F.2d 808, 809–10, 812 (1 Cir. 1926) ("while the new sales agreement was never executed * * * the [ship] * * * was being operated under an arrangement in substantial accordance therewith"). Having failed to exercise the "reasonable diligence" required by the rule set forth in Carver, supra, Texaco is thereby precluded from asserting a maritime lien against the subfreights of the vessel.

▆▆ Texaco points out that Charterer signed the voyage charter "as Agents for Owners."[23] Why this is significant in this context is not readily apparent, but it may be that Texaco is suggesting that if Charterer was agent for Shipowner, it had presumptive authority under Section 972 of the Maritime Lien Act to procure fuel for the Atlantic Sun; that Texaco could rely on such presumptive authority in furnishing bunkers to the vessel and is, therefore, entitled to a lien on subfreights. See Gilmore and Black, op. cit. supra at 555.

Examination of the documents submitted in evidence and reference to the law applicable to the construction of charter parties leads to the conclusion that the relationship between Shipowner and Charterer was that of owner-charterer and not principal-agent. Apparently, the maritime practice is that if an individual contracts to provide a vessel under a charter party, and intends to furnish a ship that he has chartered rather than his own, he is described in the subcharter party as "Chartered owner," "Freight contractor," "Disponent," or, sometimes, as "Agent or owner." Scrutton, Charter Parties 4, Note 2 and n. (t) (16th ed. 1955). The voyage charter in the instant case, in conformity with such practice, describes Charterer as "Agents for Owners or Disponent," and addendums Nos. 1 and 2 to the voyage charter refer to Charterer as "Agents for Owners or Desponent Owners."[24] Moreover, there is no other evidence in the record indicating that Charterer had any authority to act as agent for Shipowner.[25] Cf. States Marine Corp. of Delaware v. Victory Carriers, Inc., 272 F.2d 463, 468 (9 Cir. 1959) ("provide and pay for" clause does not make the charterer the agent of owner in procuring pilotage); The West Eldara, 104 F.2d 670 (same), modifying 101 F.2d 45 (2 Cir.), cert. denied, 308 U.S. 607, 60 S.Ct. 144, 84 L.Ed. 507 (1939).

20. See Ocean Cargo Exhibit M (copy of letter signed by the master of the vessel, Captain Pantelides, acknowledging receipt of "copy of Timecharter Charterparty dated 20th November, 1959, between my Owners and North Atlantic Marine Co., Inc."). The letter bears date of "9. 12. 59." which, in maritime practice, denotes December 9, 1959, see Tr. p. 62.

21. Pantelides Deposition, Answers to Interrogatories Nos. 12 and 13. Texaco made no attempt to refute this testimony, nor does it claim that it exercised "reasonable diligence."

22. Texaco's Trial Memorandum, pp. 8–9; see Stip. Exhibit F.

23. Stip. Exhibit A.

24. Stip. Exhibits B and C.

25. Shipowner's agent in Trinidad, where the fuel was loaded, was Sproston, Ltd. See Tr. pp. 69, 70.

Texaco seeks to avoid the effect of the prohibition of lien clause by arguing also (1) that the subfreights constituting the *res* of these consolidated actions were earned under the voyage charter between Charterer and the subcharterer, and that since the voyage charter contained no prohibition of lien clause, Texaco is not barred from enforcing its lien; and (2) that even if the time charter governs, the prohibition of lien clause did not deny Charterer authority to bind the subfreights, as distinguished from the vessel, for necessaries.

■ Texaco's first contention may be disposed of briefly. Section 973 of the Maritime Lien Act, in identifying the circumstances under which no lien will attach to a vessel, refers to a prohibition of lien by "the terms of *a* charter party." 46 U.S.C. § 973. (Emphasis added.) So long as a prohibition of lien clause is contained in *any* charter under which a vessel is operated at the time supplies are furnished to the vessel, a would be lienor is bound to exercise "reasonable diligence" in inquiring whether the supplies are ordered by the owner or by one having authority to bind the vessel. See Diaz v. The S.S. Seathunder, 191 F.Supp. 807 (D.Md.1961) (vessel operated under a bareboat charter containing prohibition of lien clause and under a voyage charter at time alleged materialman's lien arose).

■ Texaco's second contention rests primarily upon the authority of a line of cases arising out of the bankruptcy of the Atlantic, Gulf & Pacific Steamship Corporation. Standard Oil Company was held to have a maritime lien upon subfreights for fuel oil furnished a vessel operated by the steamship company, In re Atlantic, Gulf & Pac. S.S. Co., 3 F. 2d 311 (D.Md.1923), aff'd sub nom. Standard Oil Co. v. Miller, 3 F.2d 438 (4 Cir. 1925), although it was held to have no lien against the vessel itself which was being operated at the time under a conditional contract of sale containing a prohibition of lien provision, Standard Oil Co. v. United States, 1 F. 2d 961 (4 Cir. 1924), cert. denied, 267 U.S. 591, 45 S.Ct. 228, 69 L.Ed. 803 (1925). The question whether freights are to be treated as entirely distinct from the ship was not explicitly dealt with in these Fourth Circuit cases, but was considered at some length by the Court of Appeals for the First Circuit, which reached an opposite conclusion in United States v. Robins Dry Dock & Repair Co., supra, 13 F.2d at 812–14. There, the Court, after reviewing the cases, held that if there was no lien on the ship by virtue of a prohibition of lien clause, there could be no lien on the freight, "for freight is the hire of the ship and incident to the ship." Id. at 814. Accord, In re North Atl. and Gulf S.S. Co., 204 F.Supp. 899, 907 (S.D.N.Y.1962), aff'd sub nom. Schilling v. A/S D/S Dannebrog, 320 F.2d 628 (2 Cir. 1963) (issue not raised on appeal); Marine Chartering Co. v. Schirmer Stevedoring Co., 194 F.Supp. 488 (N.D.Cal.1961), aff'd in part on other grounds sub nom. Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp., 306 F.2d 188 (9 Cir. 1962).

■ Texaco maintains, and correctly, that the rule is that "[m]aritime liens may be obtained against freights, independent of any lien against the vessel." [26] However, the meaning of this rule, which has its genesis in United States v. Freights of S.S. Mount Shasta, 274 U.S. 466, 47 S.Ct. 666, 71 L.Ed. 1156 (1927), is that subfreights alone constitute a *res* that furnishes a sufficient basis for the exercise of in rem admiralty jurisdiction. It does not follow from this rule that a prohibition against encumbrances upon a "vessel" does not also proscribe liens against subfreights of the vessel, which have always been regarded as much a part of the ship as her tackle and machinery, United States v. Certain Subfreights Due S.S. Neponsit, 300 F. 981, 990 (D.Mass.1924), rev'd on

---

26. Texaco's Trial Memorandum, p. 15, quoting from Schirmer Stevedoring, supra, 306 F.2d at 192.

other grounds sub nom. United States v. Robins Dry Dock & Repair Co., supra;[27] see Gilmore and Black, *op cit. supra* at 511, n. 80. It would be a curious rule that permits a materialman such as Texaco to assert a claim against the subfreights of a vessel under Section 971 of the Maritime Lien Act (which speaks only of a lien upon the "vessel"), on the theory that "vessel" includes freight, see Schirmer, supra, 306 F.2d at 192; United States v. Certain Subfreights Due S.S. Neponsit, supra, and, at the same time, says that a clause in a charter prohibiting liens on the "vessel" does not extend to freights "incident" to the vessel.[28]

I hold that the prohibition of lien clause contained in the time charter in the instant case extended to liens on the subfreights of the Atlantic Sun, and that, on the facts of this case, Texaco is not entitled to a lien.

 There remains to be considered the argument that denial of a lien to Texaco will result in unjust enrichment of Shipowner, since the vessel was returned to Shipowner with fuel aboard for which Shipowner has not paid and for which Shipowner received the sum of $7,900 from the new charterer.

Assuming *arguendo* that Shipowner will be unjustly enriched,[29] recognition of an equitable lien in Texaco's favor, in effect, would defeat the statutory requirement of inquiry and "unjust enrichment would be the complete answer for

every materialman having a claim not otherwise assertible as a lien." Diaz v. The S.S. Seathunder, 191 F.Supp. 807, 823 (D.Md.1961).

If there is any legal or equitable obligation on the part of Shipowner to pay for the fuel on board at the time of redelivery, that obligation runs to the trustee of Charterer's bankrupt estate. Clause 3 of the time charter provides that "the Owners, at the port of re-delivery, shall take over and pay [Charterer] for all fuel remaining on board the vessel at the Owners' contract instalation prices in the respective ports. * * *" At the time the Atlantic Sun was withdrawn from Charterer, the fuel on board was an asset of the debtor (Charterer) and part of its estate.[30] The trustee's title to Charterer's assets relates back to the date of filing the petition, January 14, 1960. Shipowner's obligation under the charter party to pay the amount owing for the fuel aboard therefore runs to Charterer's bankruptcy trustee who may be entitled to set off that amount against Shipowner's claims, see In re North Atl. and Gulf S.S. Co., supra, 204 F.Supp. at 911–12; 4 Collier, Bankruptcy ¶ 68.13 (14th ed.), or the trustee may be able to enforce that obligation without any right of setoff in favor of Shipowner, see In re North Atl. and Gulf S.S. Co., supra, 204 F.Supp. at 911; but see 4 Collier, Bankruptcy ¶ 68.03 (distinguishing setoff from recoupment). In any event, Texaco may not invoke the rights of Charterer's trustee as a basis either for

27. With respect to the proposition in text for which this case is cited, the Court of Appeals expressed agreement with the District Court. 13 F.2d at 813.

28. The precise wording of the prohibition of lien clause in the ° instant case is: "Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel." Stip. Exhibit E, Clause 18. The owners may be said to have an "interest" in the subfreights of the vessel as security for the performance of the charterer's obligation under the charter party. The first sentence of Clause 18 expressly provides

that "the Owners shall have a lien upon * * * all sub-freights for any amounts due under this Charter. * * *"

29. However, according to a "Schedule" submitted by Shipowner (Shipowner's Post-Trial Memorandum "Exhibit A"), its claims against Charterer total $19,-859.00. Deducting from this sum the amount of $7,900.00 for the bunkers on board on redelivery and the amount of the attached subfreights of $6,053.81, there still remains a sum of $5,905.19, representing Shipowner's alleged net loss.

30. Charterer filed its Chapter XI petition in this Court on January 14, 1960. The Atlantic Sun was withdrawn from Charterer on January 20, 1960.

asserting a lien, cf. Schilling v. A/S D/S Dannebrog, supra, 320 F.2d at 632–33,[31] or reducing the amount for which Shipowner claims a lien. Texaco's remedy for the failure of Charterer to pay for the bunkers furnished it is against the bankrupt estate; with the rights and equities as between Shipowner and Charterer (the bankrupt), the materialman (Texaco) has no concern.

## II
## Validity and Extent of Shipowner's Lien

■■■ A shipowner's lien on earned subfreights owing to a charterer depends upon the inclusion of a specific lien clause in the charter of the vessel earning the subfreights. In re North Atl. and Gulf S.S. Co., 204 F.Supp. 899, 904 (S.D.N.Y. 1962), and cases cited therein, aff'd sub nom. Schilling v. A/S D/S Dannebrog, 320 F.2d 628 (2 Cir. 1963); Gilmore and Black, op. cit. supra at 517, n. 103. The time charter in the instant case contains such a clause. Clause 18 provides:

"That the Owners shall have a lien upon all cargoes, and all sub-

freights for any amounts due under this Charter. * * *"

Payment of charter hire was to be made semi-monthly in advance. (Clause 5). Shipowner received as security one-half month's hire in advance (Clause 29) and has applied this sum to unpaid hire due for the period from December 26, 1959 to January 11, 1960.[32] As of January 11, 1960, the next semi-monthly installment of charter hire in the amount of $21,621 became due and owing, and it is for this entire installment that Shipowner claims a lien.[33] Texaco maintains alternatively that (1) the charter was terminated when Shipowner gave Charterer notice of withdrawal on January 8, 1960; (2) the charter was terminated on January 10 or 12; or (3) the filing of a petition for an arrangement on January 14, 1960 terminated the charter party, and the charter hire that accrued on January 11 should be prorated accordingly.[34]

■■■■ There is no evidence in the record to support a finding that the time charter was terminated on January 10

31. In Schilling, the Court of Appeals held that a charterer was not entitled to a lien for amounts owing to him by owners for fuel on board at the time of redelivery where the owners had claims for unpaid charter hire when the ships were turned back. Therefore, the materialman who originally supplied the fuel to the charterer in such a case cannot set up the failure of an owner to pay for fuel aboard as a basis for a lien.

32. Shipowner's Post-Trial Memorandum, p. 19.

33. Texaco notes that the sole item claimed by the libel is the semi-monthly installment due on December 26, 1959, and that the libel has not been amended. Texaco's Post-Trial Memorandum, p. 8. Texaco, however does not dispute the fact that Shipowner has not been paid any monies for charter hire from December 26, 1959. Texaco will in no way be prejudiced if the claim for charter hire due January 11, 1960, is treated as if it were specifically set forth in the pleadings, particularly since, in 1960, Shipowner filed a notice of intention to amend its libel at trial to include the latter installment.

34. Texaco appears to contend, as well, that Shipowner was the principal on the voyage charter, because Charterer signed as its "agent," and, therefore, Shipowner, as obligee on the contract, has no lien against the freights earned under the voyage charter. This contention has been disposed of above. See text accompanying notes 24 and 25 supra.

Texaco also contends that Shipowner is not entitled to assert a lien under the time charter because Shipowner breached its warranty of the ship's nationality and the warranty of speed. Texaco's Post-Trial Memorandum, pp. 9–11. Assuming arguendo that there was a breach of warranty, it would give rise only to a claim for damages by Charterer, since the time charter in the instant case was partially executed in Charterer's favor, see Davison v. Von Lingen, 113 U.S. 40, 50 [5 S.Ct. 346, 28 L.Ed. 885] (1885); Romano v. West India Fruit & S.S. Co., 151 F.2d 727, 731 (5 Cir. 1945); Denholm Shipping Co. v. W. E. Hedger Co., 47 F.2d 213 (2 Cir. 1931); Carver, Carriage of Goods by Sea 239 (10th ed. 1957); 3A Corbin, Contracts § 685 at 234 (1960), and, in any event, Charterer

or 12.[35] On January 8, at 9:45 A.M., however, Shipowner's New York agent sent a telegram to Charterer, stating in part:

"* * * HAVE BEEN INSTRUCTED BY OWNERS PUT YOU ON NOTICE THAT UNLESS HIRE DUE DEC 26 1959 IS RECEIVED BY NOON TODAY *THEY WILL WITHDRAW VESL FROM SERVICE ON COMPLETION OF DISCHARGE* AND WILL BRING SUIT FOR DAMAGES RESULTING FROM BREACH OF CONTRACT IN ACCORDANCE WITH CLAUSE 5 OF T/C DATED NYK NOV 20 1959 * * *"[36] (Emphasis added.)

This notice of withdrawal was a valid exercise of the right conferred upon Shipowner by Clause 5 of the charter party which provides that "failing the punctual and regular payment of the hire * * * the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers." The effect of withdrawal of the vessel is to terminate the contract. Carver, Carriage of Goods by Sea 275 (1957 ed.). The rules to be applied in determining when a withdrawal is effective have been stated by the Court of Appeals for this Circuit in a leading decision:

"[T]he withdrawal of a vessel from a charter party means that the owner shall deprive the charterer of any further enjoyment or use of the vessel and take it into his own exclusive possession. This can be presently done, even where the vessel is at sea, provided she is light; *but if there be any cargo on board no withdrawal can be made until the cargo*

*be relanded if the vessel is at the loading port, or until it be discharged if she is at sea or at destination.*" (Emphasis added.)

Luckenbach v. Pierson, 229 F. 130, 132 (2 Cir. 1915). See also Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp., 306 F.2d 188, 193 (9 Cir. 1962). But see Italian State Rys. v. Mavrogordatos, [1919] 2 K.B. 305 (loaded vessel may be withdrawn while on high seas if that is the intention of owner). In the case at bar, Shipowner having clearly intended to withdraw the vessel only after discharge of cargo, there is an additional reason for holding that the vessel was not withdrawn and the time charter not terminated until the Atlantic Sun had completed unloading her cargo, which the parties have stipulated was at 6:30 P.M. on January 20, 1960.[37] See Jebsen v. A Cargo of Hemp, 228 F. 143, 149 (D.Mass. 1915).

When the shipowner has elected to withdraw the vessel from the service of the charterer for failure to pay accrued hire in advance, the shipowner is entitled only to hire for that portion of the time during which the charterer actually had use of the vessel. Luckenbach v. Pierson, supra; Jebsen v. A Cargo of Hemp, supra; Wehner v. Dene S.S. Co., [1905] 2 K.B. 92; Carver, *op. cit. supra* at 272; see Freights of the Kate, 63 F. 707, 709, 724, (S.D.N.Y. 1894). But see Leslie Shipping Co. v. Welstead, [1921] 3 K.B. 420 (without discussion of issue). The case at bar is distinguishable from Schilling v. A/S D/S Dannebrog, supra, in which "the already defaulting charterer took the initiative and returned the vessel prematurely, in breach of the charter" (320 F.2d 630), and apportionment was denied.[38]

---

did not at any time elect to repudiate the contract.

35. The only evidence probative of this assertion by Texaco is a statement by Captain Pantelides that he didn't "remember the exact date but * * * something happened between the 10th to the 12th

of January between the owners and the charterers." Pantelides Deposition, Answer to Cross-Interrogatory 10(b).

36. Ocean Cargo Exhibit I.

37. Tr. p. 46.

38. The Court of Appeals in Schilling expressly noted this "vital" distinction, 320

The pro rata share of charter hire for the period during which Charterer had use of the vessel (from 9:00 A.M., January 11, 1960, to 6:30 P.M., January 20, 1960) is $13,106.24, which exceeds the amount of the attached subfreights. However, it is necessary to deal with Texaco's contention that Shipowner's lien was cut off by the filing of a petition for an arrangement on January 14, which, if correct, would reduce Shipowner's pro rata share of charter hire to a sum less than the amount of the attached fund.[39]

Judge Bryan of this Court has held that the operation of a vessel under a time charter by a debtor after the filing of an involuntary Chapter X petition "was subject to such liens against subfreights as were then valid and subsisting," that the shipowner's lien attached to subfreights earned when the cargo was loaded,[40] and that the last installment of charter hire accruing prior to the filing of the petition was not subject to reduction by such filing. In re North Atl. and Gulf S.S. Co., supra, 204 F.Supp. at 909; see Gilmore and Black, op. cit. supra at 482. A contrary indication might appear from a first reading of S. & W. Holding Co. v. Kuriansky, 317 F.2d 666, 668 (2 Cir. 1963). In that case, the Court of Appeals for this Circuit made the following statement:

"Although at common law the rent is due in full on the agreed date without apportionment, this rule has been modified in bankruptcy proceedings. The debtor-lessee is held liable for the accrued rent only to the date of bankruptcy while the liability of the trustee for use and occupancy arises from that date." (Citations omitted.)

The analogy of the landlord and tenant relationship, however, may not be entirely apt as applied to a time charter, see Schilling v. A/S D/S Dannebrog, supra, 320 F.2d at 630. In addition, the Court of Appeals in Kuriansky made clear that this modification of the rule was prompted by the equitable consideration that the lessor should "not [be] permitted to accrue rent beyond the period during which the occupancy is that of the bankrupt." 317 F.2d at 669. The importance of balancing the equities of the parties in determining the propriety of apportioning an accrued installment was reiterated by the Court of Appeals in Schilling, supra, 320 F.2d at 630–31, where the Court was dealing specifically with a claim for hire under a time charter. Among the equitable considerations that the Court suggested were relevant was whether "from rechartering the vessel or otherwise, the owner realized more than the total amount remaining due under the charter, including the unpaid installment," cf. Kuriansky, supra; or whether "the owner got some value out of the vessel during the period covered

---

F.2d at 630, which is based on the theory that a charterer should not be permitted to apportion his own wrong by voluntarily returning the vessel which the shipowner cannot well refuse, see 204 F.Supp. at 908, and on the theory that if the shipowner elects to exercise his right of withdrawal, he has "waived" his claim for charter hire from the date of return of the vessel, see 320 F.2d at 631.

39. Shipowner maintains that no argument can be made that the date of filing of the petition cut off the lien since it is not known whether the charter party was assumed by the trustee. It should be noted that once an executory contract has been terminated by the election of the

other party (in this case by Shipowner on January 20), there is no longer in existence an executory contract that can be either rejected or assumed. 8 Collier, Bankruptcy ¶ 3.15[4]. However, since no claim is made for installments accruing after the date of filing, it is not necessary to deal with the question of assumption or rejection.

40. In the instant case, Shipowner's lien attached to the full amount of the subfreights at the time cargo was loaded since the voyage charter provided: "Full freight deemed earned on cargo as soon as loaded on board vessel. * * *" Stip. Exhibit A, Clause 9.

by the installment." 320 F.2d at 631. Although the specific question of the effect of bankruptcy upon a lien for an accrued installment was not raised on appeal, the Court made clear that the filing of a petition in bankruptcy does not necessarily reduce the lien. Ibid.; cf. Freights of the Kate, 63 F. 707, 708–09 (S.D.N.Y.1894) (enforcing liens for charter hire on a pro rata basis up until withdrawal of vessels on March 27, 1893, notwithstanding appointment of state court temporary receiver on March 18, 1893).

With regard to the equities here, Charterer had use of the vessel from the date of filing of the petition for an arrangement up until the end of unloading, and while Shipowner rechartered the vessel, it did not realize more under the new charter than it would have received under the old from the date of bankruptcy to the expiration of the old charter.[41] Nor did Shipowner get any value out of the vessel from the period January 14 to January 20, 1960, since performance under the new charter did not commence until the latter date.[42] I conclude that Shipowner's lien is not subject to reduction by the filing of a petition for an arrangement, but extends to the proportion of the January 11 installment ($13,-106.24) that covers the period during which Charterer had use of the vessel. Since this amount exceeds the amount of the attached subfreights, Shipowner's lien attaches to that entire fund.

Accordingly, after consideration of all the contentions of the parties and examination of the record, I hold that Shipowner has a valid maritime lien against the attached subfreights, that Texaco is not entitled to a lien, and that Texaco's libel must be dismissed.

The foregoing shall constitute findings of fact and conclusions of law of the Court pursuant to Admiralty Rule 46½.

Submit decree in accordance with this opinion.

41. See Tr. p. 50 (charter rate under new charter $.20 per ton per month less than rate under old charter).