DIANA COMPANIA MARITIMA, S.A.
OF PANAMA, Libelant,

v.

The SUBFREIGHTS OF the S.S. AD-
MIRALTY FLYER, Respondent.

No. 65 AD 1164.

United States District Court
S. D. New York.

Feb. 28, 1968.

608

Poles, Tublin, Patestides & Stratakis, New York City, for Diana Compania Maritima, S.A. of Panama, John G. Poles, Alvin L. Stern, Patrick V. Martin, New York City, of counsel.

Hahn, Hessen, Margolis & Ryan, New York City, for trustee in bankruptcy of Admiralty Lines, Ltd., Marks F. Paskes, Healy & Baillie, New York City, of counsel.

## OPINION

HERLANDS, District Judge:

Petitioner, Diana Compania Maritima, S. A. of Panama [hereinafter "Owner"], owner of the S. S. Admiralty Flyer moves for (1) an order, pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9 [1], confirming an arbitration award rendered between the Owner and Admiralty Lines, Ltd. [hereinafter "Charterer"], and (2) an order releasing the subfreights of the Admiralty Flyer presently held by the Clerk of the United States District Court for the Southern District of New York.[2] The trustee in bankruptcy of the Charterer [hereinafter "Trustee"] objects to the release of the subfreights but does not object to the confirmation of the arbitration award. For the reasons hereinafter set forth, the Owner's motions are granted in all respects.

---

1. Section 9 of the Arbitration Act pertinently provides:

   "If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding."

2. According to the Cashier of the Clerk of this Court, the fund presently amounts to $27,163.06.

In order to place this motion in proper context, the Court will fully explicate the sequence of events leading to this motion as well as all facts material to its disposition. Many of these facts are either undisputed or have been conclusively determined.[3]

On May 4, 1965, the Charterer entered into a time charter party[4] with the Commercial Steamship Company, agents for the Owner of the Admiralty Flyer. The agreement provided that the Charterer would hire the vessel for a period of about 18 to 21 months, payment of hire to be made "monthly in advance". The vessel was presented to the Charterer on July 9, 1965, and proceeded on its voyage.

On November 9, 1965, the Charterer defaulted in payment of hire due on that date. At the time of default, the vessel was proceeding toward Capetown, South Africa, where an additional breach of the charter party occurred when the Charterer failed to supply fuel.

On November 23, 1965, the Owner sent a telegram to the Charterer, giving notice of withdrawal of the vessel. The telegram read:

"IN VIEW OF YOUR BREACH OF THE TIME CHARTER BY FAILURE TO PAY HIGHER (Sic) ON THE ADMIRALTY FLIER (Sic) AND YOUR FAILURE TO SUPPLY THE VESSEL WITH BUNKERS YOU ARE HEREBY NOTIFIED THAT THE VESSEL IS WITHDRAWN BECAUSE OF YOUR BREACH AND OWNER IS TAKING STEPS TO MITIGATE DAMAGES OWNER HOLDS YOU RESPONSIBLE FOR ALL DIRECT AND CONSEQUEN-TIAL DAMAGES RESULTING FROM YOUR BREACH." (Charterer's Rebuttal Affidavit, Exhibit A)

The notice of withdrawal was given pursuant to clause 5 of the charter party.[5]

On November 29, 1965, the Owner filed a libel against the freights and subfreights of the Admiralty Flyer and attached certain subfreights in the hands of 14 cargo consignees.

Upon the arrival of the Admiralty Flyer at the United States Gulf Ports on December 25, 1965, the Owner retained possession of the cargo.

Upon motion of certain of the cargo consignees, this Court, on December 30, 1965, ordered the consignees to pay the freight due into court. This "Interim Order No. 1" provided that, upon payment, the Owner would release the cargo from the "possessory lien". The Court indicated that the purpose of the order was

" * * * to serve as a method to substitute money deposits of freights due * * * [for the asserted liens] in order to facilitate the release of said cargo and subfreights from the liens asserted * * * "

In short, the order served as a practical method of releasing the cargoes and removing the consignees from a litigation in which they had neither an actual interest nor possible liability beyond the amount of the freights due.

Since the only persons legally interested in the fund being held by the Clerk of the Court were the Owner and the Charterer, this Court, on January 3, 1966, ordered the Owner and Charterer to proceed to arbitration in accordance

3. Many of the facts set forth have been found by the arbitrators and are, therefore, binding on the parties. James Richardson & Sons, Ltd. v. W. E. Hedger Transp. Corp., 98 F.2d 55 (2nd Cir. 1938). See South East Atlantic Shipping Ltd. v. Garnac Grain Company, 356 F.2d 189, 191–192 (2nd Cir. 1966).

4. The time charter party is the standard government form of the New York Produce Exchange.

5. The precise wording of the withdrawal clause is:
"* * * otherwise failing the punctual and regular payment of the hire * * *, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers."

with clause 17 of the charter party.[6] The Court retained jurisdiction to enter a decree upon the award.

After three arbitration hearings had been held, an involuntary bankruptcy petition was filed against the Charterer on February 4, 1966. On March 15, 1966, the Charterer was adjudicated a bankrupt.

After the appointment of the Charterer's trustee in bankruptcy, a final arbitration hearing was held on May 10, 1967. The Trustee did not appear at this final hearing although prior written notice and a request to appear had been sent to the attorney for the Trustee. The "special admiralty counsel" to the attorney for the Trustee was also advised that he had 10 days to submit additional testimony; but he declined to do so.

The arbitration award, rendered on June 26, 1967, determined, *inter alia*, (1) that the Owner was entitled to withdraw the Admiralty Flyer; and (2) that the Owner sustained net damages of $40,605.95.

In opposition to the motion to release the subfreights to the Owner, the Trustee argues (1) that there is no maritime lien covering all the subfreights held by the Court; (2) that even if there is a valid maritime lien, transfer to the Owner of the funds held by the Court would run afoul of either Bankruptcy Act § 67(a), 11 U.S.C. § 107(a), or Bankruptcy Act § 60, 11 U.S.C. § 96; and (3) that an arbitration award rendered between the Owner and the Charterer cannot determine rights *in rem* in the subfreights held by the Court, and, therefore, cannot be adopted by an admiralty court as the basis of a judgment *in rem*.

## I

A shipowner's lien on earned subfreights due to a charterer is not created by general maritime law. Inclusion of an express lien clause in the charter of the vessel earning the subfreights is necessary. Ocean Cargo Lines, Ltd. v. North Atlantic Marine Co., 227 F.Supp. 872 (S.D.N.Y.1964); In re North Atlantic and Gulf Steamship Co., 204 F.Supp. 899 (S.D.N.Y.1962), and cases cited therein, affirmed sub nom. Schilling v. A/S D/S Dannebrog, 320 F.2d 628 (2nd Cir. 1963); Gilmore and Black, Admiralty 517, n. 103 (1957).

If an express lien clause is included in the charter, the shipowner has a maritime lien on the subfreights from the moment the cargo is loaded on the vessel. Krauss Bros. Lumber Co. v. Dimon S. S. Corp., 290 U.S. 117, 121, 54 S.Ct. 105, 78 L.Ed. 216 (1933); The Saturnus, 250 F. 407, 412, 414 (2nd Cir. 1918), cert. denied sub nom. Midland Linseed Products Company v. The Steamship "Saturnus", 247 U.S. 521, 38 S.Ct. 583, 62 L.Ed. 1247 (1918); In re North Atlantic and Gulf Steamship Co., 204 F.Supp. at 904; In re Bauer Steamship Corporation, 167 F.Supp. 909, 910 (S.D.N.Y.1957).

In the instant case, the time charter contains a clause creating a lien on freights and subfreights. The clause provides:

"18. That the Owners shall have a lien upon all cargoes, and all subfreights for any amounts due under this charter * * *"

By this clause, the Charterer's lien against the consignees to secure the subfreights is made subject to the Owner's lien against cargoes and subfreights.

6. The arbitration clause in the charter party provides:
"That should *any dispute* arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties thereto, and the third by the two so chosen; their decision or that of any two of them, *shall be final,* and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men." (Emphasis added.)
The Submission Agreement, executed January 20, 1966, provides for arbitration of "any disputes between the owner and the charterer arising out of this charter party."

In re North Atlantic and Gulf S. S. Co., supra; In re Bauer S. S. Corp., supra. Moreover, the Owner's lien was not relinquished by this Court's order directing payment of the subfreights into Court. The Trustee, however, argues that the maritime lien does not extend to all the funds held by this Court. It is his contention that the "present" language contained in the Owner's notice of withdrawal of November 23, 1965 and the resultant exercise of control over the Admiralty Flyer by the Owner show that withdrawal of the vessel took place on that date.

■ The effect of withdrawal of a vessel is to terminate the charter party. Ocean Cargo Lines, Ltd. v. North Atlantic Marine Co., 227 F.Supp. at 881. There is no dispute that the Admiralty Flyer was withdrawn; the only question is *when* was the withdrawal "effective". The significance of the date when the withdrawal became effective is that the amount of the Owner's lien is computed as of that date.

The notice of withdrawal herein clearly speaks in "present" terms. It states that " * * * you are hereby notified that the vessel is withdrawn * * * and owner is taking steps to mitigate damages." In addition, the arbitrators found:

"6. Owners in mitigation of damages, obtained additional cargo for the vessel at Walvis Bay, South Africa, for discharge at United States Gulf Ports and did pay all expenses incident to the loading carriage and discharge of said cargo including those which would properly have been the obligation of the Time Charterers."

It is this latter fact upon which the Trustee places chief reliance to support his assertion that the Charterer was deprived of control of the vessel on, or about, November 23, 1965, the date of the notice of withdrawal.

In the leading case of Luckenbach v. Pierson, 229 F. 130 (2nd Cir. 1915), the time charter provided that hire was to be paid semi-monthly in advance, with the shipowner having the "faculty of withdrawing the said steamer" upon default of such payment. Hire due on June 11, 1906 was already in arrears when the shipowner, on June 27, wrote the charterer that, if the arrears were not paid " * * * by four o'clock this afternoon, I *will withdraw* said steamer from your service * * * " (Emphasis added.) At that time, the vessel was being loaded in port. However, the shipowner did not withdraw the vessel on that date. Instead, the vessel sailed; and, on June 30th, the shipowner informed the charterer that the vessel would be withdrawn at the end of the trip.

The Court held that the vessel was not withdrawn on June 27, the date of the notice of withdrawal, because the shipowner allowed the vessel to "proceed on her voyage, a proceeding entirely inconsistent with a then withdrawal" (229 F. at 132). The Court observed that the shipowner could have withdrawn the vessel on the date of the notice of withdrawal by relanding the cargo.

It should be noted that the notice of withdrawal in *Luckenbach* clearly contained "present language"; however, that fact was not deemed controlling. Cf. Jebsen v. A Cargo of Hemp, 228 F. 143, 149 (D.Mass.1915) (date of withdrawal determined from owner's conduct controls despite contrary indication in notice of withdrawal).

Judge Ward, writing for the Court of Appeals for this Circuit in *Luckenbach,* stated the rule to be applied:

"[T]he withdrawal of a vessel from a charter party means that the owner shall deprive the charterer of *any* further enjoyment or use of the vessel and take it into his own *exclusive* possession. This can be presently done, even where the vessel is at sea, *provided she is light; but if there be any cargo on board no withdrawal can be made until the cargo be relanded if the vessel is at the loading port, or until it be discharged if she is at sea or at destination."* (229 F. at 132) (Emphasis added)

The rule of Luckenbach v. Pierson has recently been followed and approved in this circuit, Ocean Cargo Lines, Ltd. v. North Atlantic Marine Co., 227 F.Supp. 872, 881 (S.D.N.Y.1964), and in the Ninth Circuit, Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp., 306 F.2d 188, 193 (9th Cir. 1962).[7]

■ Applying the rule of Luckenbach v. Pierson to the instant case, the Court holds that withdrawal of the Admiralty Flyer did not become effective until the cargoes were discharged at the United States Gulf ports in December of 1965. As *Luckenbach* makes clear, the language of the notice of withdrawal is not controlling. The Court rejects the Trustee's argument that the Owner assumed control of the Admiralty Flyer by loading additional cargo at Walvis Bay, South Africa because the Owner could not re-charter the vessel until all of the cargo was discharged at the Gulf Ports. Since Luckenbach v. Pierson is based upon the assumption that a shipowner cannot have "exclusive possession" or control of his vessel while the charterer's cargo is aboard, obedience to that rule requires a holding that no withdrawal of the Admiralty Flyer became effective due merely to the loading of the additional cargo at Walvis Bay.

■■ Even were this Court to hold (which it does not) that withdrawal of the Admiralty Flyer was effective at an earlier date, the owner would nevertheless be entitled to release of the subfreights. Although the maritime lien would then not extend to all of the funds held by this Court, the Owner would be entitled to the subfreights as "incidental to ownership" of the vessel. Layne & Bowler Corp. v. United States Shipping

Board Emergency Fleet Corp., 27 F.2d 39, 41 (9th Cir. 1928). Subfreights not due at the time of withdrawal, but which become due thereafter, belong to the owner and not the charterer. See Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp., 306 F.2d at 192 (shipowner prevails over assignee of time charterer of vessel); Layne & Bowler Corp. v. United States Shipping Board Emergency Fleet Corp., supra.

■ Since this Court has determined that the withdrawal was effective at the time the cargo was discharged, the Owner has a lien on "any amounts due" under the charter as of that date. See Luckenbach v. Pierson, 229 F. at 133; Freights of the Kate, 63 F. 707, 722 (S.D.N.Y. 1894); Ocean Cargo Lines, Ltd. v. North Atlantic Marine Co., 227 F.Supp. at 881. The lien on the subfreights presently held by this Court is, therefore, valid under maritime law.

## II

Having concluded that the Owner has a valid maritime lien on the subfreights, the Court must next determine the effect of the Bankruptcy Act on that lien.

■ A trustee in bankruptcy takes the debtor's property subject to all valid liens and equities enforceable against the bankrupt, except where the lien is expressly rendered void by the terms of the Bankruptcy Act. Zartman v. First National Bank, 216 U.S. 134, 138, 30 S.Ct. 368, 54 L.Ed. 418 (1910) (trustee not a bona fide purchaser); Lockhart v. Garden City Bank & Trust Co., 116 F.2d 658, 661 (2d Cir. 1940).

■ The Owner's maritime lien · is valid under federal admiralty law and was in existence before the date of the filing of the bankruptcy petition.[8] It is,

7. The Trustee places some reliance on Italian State Ry. v. Mavrogordatos, [1919] 2 K.B. 305, which held that a withdrawal was effective immediately even though a vessel was on the high seas. Italian State Ry. represents the English rule as to when a notice of withdrawal is effective. See Scrutton, Charterparties and Bills of Lading (17th ed. 1964) 355; Carver, Carriage By Sea

(11th ed. Colinvaux 1963) 388. But the English rule is clearly contrary to that which is the law in the Second Circuit. Moreover, Italian State Ry. is factually distinguishable: the vessel had no cargo aboard and was proceeding toward the point of redelivery when the notice of withdrawal was sent.

8. The bankruptcy petition was filed on February 4, 1966.

therefore, a valid lien in bankruptcy unless it is invalidated by an express provision of the Bankruptcy Act. See 4 Collier on Bankruptcy (14th ed. Moore 1967) § 70.70.

■■■ The Trustee relies on Section 60 of the Bankruptcy Act, 11 U.S.C. § 96,[9] as authority for invalidating the maritime lien. This reliance is misplaced. Even assuming that the lien arose within four months of the date of the filing of the petition in bankruptcy, there is no antecedent debt in the circumstances of this case. Ricotta v. Burns Coal & Building Supply Co., 264 F.2d 749, 750, 751 (2nd Cir. 1959) (mechanics lien); Foster v. Manufacturers' Finance Co., 22 F.2d 609, 610 (1st Cir. 1927), cert. denied 276 U.S. 633, 48 S.Ct. 339, 72 L.Ed. 742 (1928) (equitable lien). See 4 Remington, Bankruptcy Law (rev. ed. 1957) § 1742. Since the Owner is a secured creditor, transfer of the funds to him pursuant to an order of this Court would not constitute a voidable preference. Walker v. Wilkinson, 296 F. 850, 852 (5th Cir.), cert. denied 265 U.S. 596, 44 S.Ct. 639, 68 L.Ed. 1198 (1924); 3 Collier on Bankruptcy §§ 60.-20, 60.22. See Morris v. Neumann, 293 F. 974, 976 (8th Cir. 1923) (judgment based upon previous valid lien not a voidable preference).

■■■ Nor does Section 67(a) (1) of the Bankruptcy Act, 11 U.S.C. § 107 (a) (1),[10] aid the Trustee's position. Section 67(a) of the Bankruptcy Act neither applies to nor invalidates contractual, common law, equitable and statutory liens. Muffler v. Petticrew Real Estate Co., 132 F.2d 479, 482 (6th Cir. 1942), cert. denied 319 U.S. 766, 63 S.Ct. 1329, 87 L.Ed. 1715 (1943) (real estate mortgage); Farrell v. Wysong, 246 F. 281, 283 (8th Cir. 1917) (vendor's lien); Moore v. Green, 145 F. 472 (4th Cir. 1906), cert. denied sub nom. Porterfield v. Moore, 206 U.S. 566, 27 S.Ct. 797, 51 L.Ed. 1191 (1907) (suit to have deed of trust declared a lien for benefit of creditors); Bickel v. Polaris Inv. Co., 155 F.Supp. 411, 412, 17 Alaska 389 (D.Alaska 1957) (landlord lien obtained by distraint); Wallace T. Bruce, Inc. v. Najarian, 249 Minn. 99, 81 N.W. 2d 282 (Sup.Ct.1957) (mechanic's lien). See also 4 Collier on Bankruptcy § 67.-03[1]; 4 Remington, Bankruptcy Law § 1610.

■■■ No legal or equitable process or proceeding is required for the creation of a maritime lien on subfreights. In re North Atlantic and Gulf Steamship Co., 204 F.Supp. at 905. Cf. The Ironsides, 13 Fed.Cas. p. 103, No. 7,069 (N.D. Ill.1869). The maritime lien in the present case arose solely out of the charter party of May 4, 1965—a maritime contract—and is, therefore, not "obtained" by legal or equitable process or proceeding. The fact that the Owner, on November 29, 1965, attached various cargoes aboard the Admiralty Flyer does not transform the maritime lien into one *"obtained* by attachment * * * or other legal or equitable process or proceeding * * *" A distinction must be made between the creation and the

---

9. Bankruptcy Act § 60, 11 U.S.C. § 96, provides in part:

"§ 96. Preferred creditors

(a) (1) A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

10. Bankruptcy Act § 67(a) (1), 11 U.S.C. § 107(a) (1) provides:

"Every lien against the property of a person *obtained* by attachment, judgment, levy, or other legal or equitable process or proceedings within four months before the filing of a petition initiating a proceeding under this title by or against such person shall be deemed null and void (a) if at the time when such lien was obtained such person was insolvent * * *" (Emphasis added.)

enforcement of a lien. The statutory text in question—Section 67(a) of the Bankruptcy Act—does not address itself to liens *enforced* by legal or equitable process or proceeding, but only to liens *"obtained"* by such process or proceedings. In re North Atlantic and Gulf Steamship Co., 204 F.Supp. at 905, and cases cited therein; 4 Remington, Bankruptcy Law (rev. ed. 1957) § 610.

The maritime lien on all the subfreights presently held by the Court is, therefore, valid as against the Trustee under any and all provisions of the Bankruptcy Act.

### III

The only other question remaining for decision is whether the arbitration award, rendered pursuant to an order of this Court, can be effective to determine rights *in rem* which an admiralty court may adopt as the basis of a judgment *in rem*. This question is answered in the affirmative.

▮▮▮ On January 3, 1966, this Court ordered the Owner and the Charterer to proceed to arbitration, because they were the only claimants to the subfreights. The arbitration award, rendered on June 26, 1967, is conclusive on the parties as to the question of the *right* to withdraw the Admiralty Flyer as well as all other issues submitted to arbitration. James Richardson & Sons, Ltd. v. W. E. Hedger Transp. Corp., 98 F.2d 55, 57 (2nd Cir. 1938), cert. denied 305 U.S. 657, 59 S.Ct. 357, 83 L.Ed. 426 (1939). Since the obligation of the Owner and the Charterer—contained in clause 17 of the charter party—was to arbitrate "any dispute" arising out of the charter of the Admiralty Flyer [11] and the arbitrators found for the Owner, various subsidiary

issues of fact were necessarily submitted to the arbitrators, cf. Sociedad Armadora Aristomenis Pan., S.A. v. Tri-Coast S.S. Co., 184 F.Supp. 738 (S.D.N.Y.1960), and must be deemed determined in the Owner's favor, James Richardson & Sons, Ltd. v. W. E. Hedger Transp. Corp., supra.

The Trustee, however, asserts that the confirmation of the arbitration award must be limited to a judgment *in personam* between the Owner and the Charterer. In support of his position, the Trustee places primary, if not exclusive, reliance on the case of Brescia Const. Co. v. Walart Const. Co., 264 N.Y. 260, 190 N.E. 484, 93 A.L.R. 1148 (1934). That decision of the New York Court of Appeals held that an arbitration award cannot enforce a mechanic's lien. However, *Brescia* is entirely inapposite as the decision was based upon the provisions of Section 19 of the New York Lien Law, McKinney's Consol.Laws, c. 33. The mere fact that a "lien" was involved in *Brescia* and a "lien" is involved in the instant case does not mean that *Brescia* is even persuasive authority here.

▮▮▮ Whether the arbitration award can conclusively determine *in rem* rights to the monies held by the Court is necessarily controlled by an interpretation of Section 8 of the Federal Arbitration Act, 9 U.S.C. § 8.[12] The purpose of Section 8 is to give an "aggrieved" party the benefit of the security provided by jurisdiction *in rem* while preserving the right to arbitrate. Marine Transit Corp. v. Dreyfus, 284 U.S. 263, 275, 52 S.Ct. 166, 76 L.Ed. 282 (1932); Greenwich Marine, Inc. v. S. S. Alexandra, 339 F.2d 901, 904 (2nd Cir. 1965). The meaning and effect of Section 8 present a question of federal substantive law.

---

11. This Court, on consent of the Owner and the Charterer, ordered these parties to proceed to arbitration in accordance with the charter party.

12. Section 8 of the Arbitration Act provides:

"If the basis of jurisdiction be a cause of action otherwise justiciable in admiralty, then, notwithstanding anything herein to the contrary, the party claiming to be aggrieved may begin his proceeding hereunder by libel and seizure of the vessel or other property of the other party according to the usual course of admiralty proceedings, and the court shall then have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award."

Cf. Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402 (2nd Cir. 1959), cert. dismissed 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1961).

Although the order to arbitrate ran only against the Owner and the Charterer, inasmuch as the attachment was proper and the libel originally filed in the instant case was "otherwise justiciable in admiralty," 9 U.S.C. § 8, an order confirming the arbitration award pursuant to 9 U.S.C. § 9 is effective *in rem* against the subfreights. Cf. Marine Transit Corp. v. Dreyfus, 284 U.S. 263, 52 S.Ct. 166, 76 L.Ed. 282 (1932).

The arbitration award rendered between the Owner and the Charterer is confirmed. The Owner is entitled to release of the subfreights presently held by the Clerk of the Court. So ordered.